EDWARD J. LAMPORT and COMMERCE TRUST COMPANY v. GENERAL ACCIDENT, FIRE & LIFE ASSURANCE CORPORATION, LTD., Appellant.

Division Two, July 27, 1917.

1. **ACCIDENT INSURANCE: Accidental or Intentional Injury.** Evidence tending to show that plaintiff fell from the step of a street car, his shoulders striking the ground first; that immediately after the accident a bruised place was discovered on the rear portion of the top of his head and he was lying on his back, his left hand crushed; that the unconsciousness was caused by concussion of the brain resulting from the injury to his head, and could not have been produced by the injury to his hand; and that he became unconscious before his hand was crushed, is evidence that the injury was accidental, and that he did not intentionally thrust his hand under the car wheel, and made a case for the jury.

2. ————: **Warranties: That Beneficiary Was Wife.** In a suit on an accident policy by the insured for injuries to himself, a warranty in the policy that a certain named woman was his wife is not material, and if untrue is not a defense. The purpose of naming a beneficiary is to designate a person who will receive the insurance money only in event of insured's death.

3. ————: ————: **Policies of Life Insurance: Materiality: Questions for Jury.** An accident policy, at least those portions of it providing indemnity for loss of life, is a policy of life insurance, within the meaning of the suicide statute (Sec. 6937, R. S. 1909), and that statute provides that no misrepresentation made in obtaining a policy of insurance on the life of any person shall be deemed material

unless the matter misrepresented actually contributed to the contingency or event on which the policy is to become void, and whether it so contributed in any case shall be a question for the jury. Even though the representation or warranty as to the beneficiary in case of the insured's death is false, the court cannot peremptorily instruct to find for the company, for the jury still have the right to say whether such misrepresentation actually contributed to the loss.

4. ———: Warranties: Insured's Habits of Life: Income: Other Insurance. Even though the insured warranted that his habits of life were correct, that his income per week exceeded the gross amount of weekly indemnity promised in all accident policies carried by him, and that he had no other accident insurance, if the evidence upon the issue of the falsity of these warranties is conflicting, the matter is for the jury, and the court cannot peremptorily instruct them to find for defendant.

5. INSTRUCTIONS: Assuming Disputed Facts: Comment on Evidence. Instructions which assume as true facts in dispute, or contain unwarranted comments on the evidence, should be refused.

6. ———: Plaintiff's Failure to Testify. An instruction telling the jury that plaintiff was present in court and heard the testimony of witness relating his conduct and movements about the time he received the injury complained of, and that from his failure to take the stand in his own behalf a strong presumption of law arises that his testimony, if given, would not sustain the issues on his part, if ever proper, is not proper in a case where defendant took plaintiff's deposition, which covered every point that might possibly relate to the issues, and read it to the jury.

7. EVIDENCE: Moral Character of Insured: Charges in Another Court. A charge contained in the answer of plaintiff's wife filed in a divorce proceeding wherein plaintiff was charged with sexual perversion, is not evidence of such fact. Nor is the mere fact that plaintiff stood charged at the time of his suit on the accident policy with a criminal charge in another court, any evidence that he is guilty of the charge.

8. ———: Exhibition of Injured Arm in Court. The exhibition in open court by plaintiff of his injured arm, which is the subject of his suit on an accident policy, at the request of his attorney, to a physician who at the time was testifying, to which an objection was sustained, after which no request was made that the jury be discharged or that counsel be admonished for his conduct, is no ground for reversal.

9. JUROR: Voir Dire Examination. If the record leaves in doubt what questions were asked and what actually occurred upon the *voir dire* examination of the juror, his alleged false answers cannot be reviewed on appeal.

10. **SUPPLEMENTAL MOTION FOR NEW TRIAL: Untimely.** Matters attempted to be preserved by a supplemental motion for a new trial filed out of time cannot be considered.

Appeal from Jackson Circuit Court.—*Hon. O. A. Lucas,* Judge.

AFFIRMED.

*J. C. Rosenberger* and *Rollin E. Talbert* for appellant.

(1) The court erred in refusing to give the peremptory instruction asked by defendant at the close of the whole case. There was no evidence that the injury was accidental and all the evidence showed that it was intentionally self-inflicted. (a) Lamport's failure to testify as a witness in his own behalf, though present in court, or to explain or deny the overwhelming proof against him is a confession of guilt. 1 Starkey on Evidence, p. 54; Moore on 'Facts, pp. 571, 574, 575; McClanahan v. Railroad, 147 Mo. App. 386; Cass County v. Green, 66 Mo. 512; Mockowick v. Railroad, 196 Mo. 571; Dickinson v. Bentley, 80 Ala. 482; Bryant v. Tink, 75 Iowa, 516; Keller v. Gill, 92 Md. 190; Societe, etc. v. Allen, 90 Fed. 815. (b) A party who hears witnesses give evidence against him and who does not take the witness stand to deny or explain the testimony of such witnesses, such testimony is to be taken as true "as much so as if the party had made the admission in express terms." Payne v. Railroad, 136 Mo. 594; State v. Musick, 101 Mo. 271; State v. Patrick, 107 Mo. 174; State v. Alexander, 147 Mo. 386. (c) Lamport being alive, in court and able to testify and he having wilfully failed to testify, he is not entitled to any presumption of innocence or of self-preservation or of due care. Mockowick v. Railroad, 196 Mo. 571. (d) In cases of this kind it is competent and relevant for defendant to prove the man's conduct, financial straits, secret frauds and crimes, situation in life, domestic and family complications, entanglements with women, sexual perversion and general depravity not only at

the time of the act in question but before and after the act, all as bearing upon the surrounding circumstances, his mental state, motive and intent at and before the time of the act under investigation. The issue involving an act of great moral turpitude, not committed by ordinary men, the widest latitude was to be allowed the defendant in showing these matters. Ex parte Alexander, 163 Mo. App. 615; Long v. Ins. Co., 113 Iowa, 259; Kerr v. M. W. A., 117 Fed. 593; Agnew v. Ins. Co., 95 Wis. 445; Shoe Co. v. Ins. Co., 8 Tex. Civ. App. 227; Smith v. Ins. Co., 123 N. Y. 85; Joy v. Ins. Co., 32 Tex. Civ. App. 443. (e) The direct evidence of numerous eye witnesses who saw the occurrence and saw Lamport deliberately put his hand on the track stands wholly undenied. (f) The circumstantial evidence establishing Lamport's motive, intent, history and situation in life, and his incriminating conduct at and before the occurrence, stands wholly undenied. Long v. Ins. Co., 113 Iowa, 259; Ex parte Alexander, 163 Mo. App. 615; Kerr v. M. W. A., 117 Fed. 593; Agnew v. Ins. Co., 95 Wis. 445; Shoe Co. v. Ins. Co., 8 Tex. Civ. App 227; Smith v. Ins. Society, 123 N. Y. 85; Joy v. Ins. Co., 32 Tex. Civ. App. 433. (g) The physical facts, to-wit, the slow movement of the street car, the man's conceded position just after the injury, and all of the physical surrounding circumstances show that it was impossible for him to have injured himself except on purpose. Daniels v. Elev. Ry. Co., 177 Mo. App. 280; Scroggins v. Met. St. Ry. Co., 138 Mo. App. 215. (h) Appellate courts will not hesitate to set aside the verdict of a jury which is clearly against the evidence or not based on sufficient evidence. Champagne v. Hamey, 189 Mo. 709; McClanahan v. Railroad, 147 Mo. App. 386; Spiro v. Transit Co., 102 Mo. App. 250; Spohn v. Railroad, 87 Mo. 74; Lehinck v. R. R., 118 Mo. App. 611; Demaet v. Storage Co., 121 Mo. App. 92. (i) And this is especially true when the prevailing party has failed to produce his own or other evidence under his control or has stifled evidence. McClanahan v. Railroad, 147 Mo. App. 410; Fisher v. Ins. Co., 124 Tenn. 462; Payne v. Railroad, 136 Mo. 594. (2) The court

erred in overruling defendant's demurrer to the evidence for the further reason that on the undisputed evidence Lamport obtained the policy by making false warranties in the policy touching (a) his habits of life; (b) his relationship to the beneficiary whom he represented as his wife but who was in fact his mistress; (c) his income; and (d) his other accident insurance which was falsely stated. These warranties having been false were breached and rendered the policy void. (a) Lamport's statements in the schedule of warranties that he was a married man, and that the beneficiary, "Mamie Lamport," was his wife and touching his habits, income, etc., were warranties, were material to the risk and, being false, rendered the policy absolutely void. Ashford v. Insurance Co., 80 Mo. App. 638; Van Cleave v. Insurance Co., 82 Mo. App. 668; Aloe v. Mutual Reserve, 147 Mo. 573; Pacific Mutual L. Ins. Co. v. Glaser, 245 Mo. 377; Claver v. Mod. Woodmen, 152 Mo. App. 164; Gaines v. Insurance Co., 188 N. Y. 411; Gaines v. Insurance Co., 93 App. Div. (N. Y.) 524; Jeffries v. Insurance Co., 22 Wall. (U. S.) 47; Makel v. Insurance Co., 95 App. Div. (N. Y.) 261; Insurance Co. v. Lindsay, 111 Va. 389; Insurance Co. v. White, 100 Pa. St. 12; (b) Where, as here, the policy recites that it is issued in consideration of the statements made in the schedule of warranties, attached thereto and made part thereof, "which the insured makes and warrants to be true on the acceptance of the policy," and the insured does accept the policy containing said warranties, he will not be heard to say that the contents of said schedule were not warranties and any untrue statement therein will avoid the policy. Wollman v. Casualty Co., 87 Mo. App. 766; Bonewell v. Acc. Co., 160 Mich. 137; Gaines v. Fid. & Cas. Co., 188 N. Y. 411; Ins. Co. v. Crabtree, 146 Ky. 371; French v. Fid. & Cas. Co., 135 Wis. 259; Kirkpatrick v. Guarantee & Acc. Co., 139 La. 370. (c) Sec. 6937, R. S. 1909, which provides that breach of warranty shall be no defense to a suit on a policy of insurance "on life" unless the matter represented "contributed" to the loss insured against, has no application to this case because this is not a

suit to recover life insurance but is upon an accident policy to recover for a non-fatal injury upon one of numerous severable and independent covenants to pay indemnity for various specified losses, wholly distinct from the promise to pay for loss of life, so that this is not a suit on policy of insurance "on life." Logan v. Casualty Co., 146 Mo. 116; Crossan v. Ins. Co., 133 Mo. App. 540; Trabue v. Ins. Co., 121 Mo. 75; Kountz v. Ins. Co., 42 Mo. 126; Loehner v. Ins. Co., 17 Mo. 247; Stephen v. Ins. Co., 61 Mo. App. 194; Jenkins v. Ins. Co., 58 Mo. App. 210. (d) The aim and object of the "misrepresentation" statute (Sec. 6937) was to protect the beneficiary, after the lips of the insured had been sealed by death, and was not enacted for the benefit of the insured himself, suing on an accident policy during his lifetime. Scheurman v. Ins. Co., 165 Mo. 649; Glaser v. Ins. Co., 245 Mo. 386. (e) The statute (Sec. 6937) being in derogation of the right of private contract should not be construed to include more than its plain language imports. Glaser v. Pacific Mutual, 245 Mo. 386; Whalen v. Casualty Co., 87 Maine, 543; Casualty Co. v. Dorough, 107 Fed. 393; Ticktin v. Ins. Co., 87 Fed. 543; Ins. Co. v. Carroll, 86 Fed. 567; National Acc. Co. v. Dolph, 94 Fed. 743; 36 Cyc. 1168. (3) The court erred in refusing to give instruction 21 requested by defendant which would have informed the jury of the presumption raised against Lamport through his failure to take the witness stand. Fisher v. Travelers Ins. Co., 124 Tenn. 462; McClanahan v. Railroad, 147 Mo. App. 386; Payne v. Railroad, 136 Mo. 594; State v. Alexander, 119 Mo. 461.

*Martin J. O'Donnell, Robinson & Goodrich* and *B. C. Howard* for respondents.

(1) Under the evidence the court properly submitted the case to the jury and properly approved their verdict since the evidence showing that Lamport was accidently injured was not only substantial but conclusive; the function of this court is to affirm the judgment. State ex rel. v. Ellison, 256 Mo. 644; State v. Taylor, 261

Mo. 229; Gannon v. Gas Light Co., 145 Mo. 502; Linderman v. Carmin, 255 Mo. 66; Ry. Co. v. Wright, 11 App. Cas. 152; Gilkey v. Sovereign Camp, 178 S. W. 789. (2) Appellant's contention that the alleged failure of Lamport to climb on the witness stand and reiterate the testimony given in his deposition and read to the jury by appellant gives this court jurisdiction to hold that the jury violated their oaths in finding for respondents finds no warrant in the law or in the statute making parties competent witnesses. Sec. 6354, R. S. 1909 Kerstner v. Vorweg, 130 Mo. 200. The taking of Lamport's deposition and reading same to the jury at the trial made him defendant's witness for all purposes and it could not thereafter impeach him. Black v. Epstein, 221 Mo. 286; Ex parte Welborn, 237 Mo. 306; Johnson v. Magruder, 15 Mo. 365; Fagate v. Carter, 6 Mo. 272. The deposition of Lamport was evidence which the jury had a right to believe or not as they pleased, even if it be regarded merely as an admission. State v. Carlisle, 57 Mo. 106; Greenleaf on Evidence, sec. 201; People v. Loomis, 178 N. Y. 405; State v. Mekel, 189 Mo. 322; State v. Simonson, 172 S. W. 602. (4) There were no warranties set out in the schedule. Nor were warranty breaches shown. (a) The statements in the schedule of warranties are merely questions which are partly answered or omitted to be answered. Hence they are not warranties. Everson v. Assurance Corp., 202 Mass. 177; McKennon v. Ins. Co., 72 N. J. L. 29; French v. Casualty Co., 115 N. W. 869; Maloney v. Casualty Co., 167 S. W. 845; Dilleber v. Ins. Co., 69 N. Y. 256; Association v. Smith, 86 Ill. App. 427. (b) The statement concerning beneficiary was not a warranty because it went to the description or identity of the beneficiary and not to the validity of the policy. Ins. Co. v. Floyd, 94 Atl. 515; Vivian v. Knights, 20 Atl. 36; Ins. Co. v. Martin, 133 Ind. 381; Van Cleave v. Co., 82 Mo. App. 668; James v. Council, 130 Fed. 1014; Goff v. Lodge, 90 Neb. 578; Ins. Co. v. Link, 230 Ill. 273. (c) The statement in italics concerning other insurance was merely a partial answer, true as far as it went, and not an affirmation of something not true and, further-

more, Lamport had no insurance other than that mentioned in the statement. Emerson v. Accident Co., 202 Mass. 177; Dilleber v. Ins. Co., 69 N. Y. 256. (d) Sec. 6937, R. S. 1909, makes warranties in a policy such as that involved herein immaterial unless it is alleged and proved that the warranty breaches contributed to the accident (not to intent as here alleged), which otherwise would operate to make the policy due and payable. Sec. 6937, R. S. 1909; Hill v. Acc. Assn., 189 S. W. 587; Logan v. Casualty Co., 146 Mo. 114. (e) The policy is to be interpreted as though the statute were written into it. Christian v. Ins. Co., 143 Mo. 465; Logan v. Casualty Co., 146 Mo. 114; Nooms v. Casualty Co., 172 Mo. App. 241; Applegate v. Ins. Co., 153 Mo. App. 63; Moore v. Ins. Co., 112 Mo. App. 702. The policy was issued after the Missouri statute had been judicially interpreted to apply to a similar policy and defendant should be held to have adopted that construction as part of its contract. Lowenstein v. Co., 88 Fed. 474, 97 Fed. 17; Conssback v. Co., 116 Wis. 382. (f) A policy insuring against loss of a hand is a policy of insurance on life within the meaning of the statute. Cook on Life and Accident Ins., secs. 1, 2, 105, 106; Richards on Ins., sec. 14.

WILLIAMS, J.—This is a suit upon a policy of accident insurance to recover the sum of ten thousand dollars for the loss of the left hand above the wrist. The policy provided an indemnity of $10,000 for loss of life and, among other things, provided for paying a like amount for loss of one hand by severance at or above the wrist if the injury be sustained "while a passenger in or on any regular passenger conveyance provided by a common carrier (including the platform, steps or running board of railway or street railway cars." The policy was dated August 1, 1911, and was for a period of three months from its date. In the schedule of warranties contained in the policy it is stated that the beneficiary named in the policy, Mamie Lamport, is the wife of the insured; that the insured had no other accident -or health insurance except a five-thousand-dollar policy

in the same company; that his income per week exceeded the gross amount of weekly indemnity under all policies carried by him, and that his habits of life were correct and temperate.

Trial was had before the circuit court of Jackson County, resulting in a verdict and judgment for the plaintiff. Thereupon the defendant duly perfected an appeal.

The accident occurred about ten o'clock p. m., August 10, 1911, at the street-car stop at the entrance to Fairmount Park, near Kansas City, Missouri. A considerable crowd of people who had been patronizing the park were waiting for a street car. Plaintiff was in this crowd. The number in the crowd was estimated, by the different witnesses, at from twenty to two or three hundred people. As the street car was about to stop for the purpose of receiving passengers from this crowd, plaintiff jumped on to the front step thereof and took hold of the hand-hold. The car then moved about twenty feet farther, with him in this position, when he fell from the step; and while the car was moving slowly it ran over his left hand necessitating the amputation thereof.

Witnesses produced by plaintiff narrated the occurrence as follows:

Louise Ruyssers testified that she and her three sisters were in the crowd waiting for the car and that they were standing near the track as the front end of the car passed them and that something ''gave her sister such a knock that she was forced to step back in order to gain her balance.'' The witness then heard someone scream that a man was hurt. She then turned and saw the plaintiff on the ground, on his back, lying parallel with the car, with his head toward the front end of the car. The plaintiff was groaning.

Sophie Ruyssers corroborated the above testimony of her sister and said that it must have been the man on the car that brushed against her sister. They next noticed the man lying on the ground with his hand crushed.

Matilda Ruyssers corroborated the testimony of her sisters and said that someone on the front end of the car brushed by her and that she had to step back to gain her balance; that she was not hurt, but that her balance was disturbed and that she fell back against her sister.

Dr. Richard Callaghan, the local surgeon for one of the railroad lines entering Kansas City, testified that he saw the plaintiff get on the front end of the car, about eight feet ahead of where the witness was standing. The witness had himself intended to get on the step, but the plaintiff got on ahead of him, and the witness then turned his attention to the rear end of the car. The witness was not looking at plaintiff when the accident occurred, but immediately went to plaintiff's assistance and found him lying unconscious on the ground with his left hand crushed. The witness also found a bruised place on the rear portion of the top of plaintiff's head. This witness testified that passengers were let in at both ends of the car, on that night, at that place. That when the accident occurred the car was moving slowly, preparing to stop. The witness further testified that plaintiff was suffering from concussion of the brain and that the concussion of the brain rendered plaintiff unconscious; that, plaintiff "came to" in about thirty minutes, but did not become rational and fully regain consciousness until the next morning; that the injury to the hand could not have caused the unconsciousness, but that it could have been caused from the bruise on the head. This witness accompanied plaintiff to the hospital and there aided in amputating the hand. The plaintiff did not sufficiently regain his consciousness to be able to help determine about the amputation of his hand, but the physician in charge decided that it was the necessary thing to do, and it was accordingly done.

Oscar H. Stevens testified that it was crowded around the car; that there was a "bunch" on the front end; that plaintiff was knocked or brushed off and fell and was in under the car "and it looked like he was going to get his head and everything cut off," and the witness grabbed plaintiff by his feet and pulled him out

from under the car. The witness testified that several people were trying to get on the front end of the car, including himself. The witness said: "I couldn't say about seeing the man fall—such a mob there and crowd, and they was all grabbing, I couldn't—some kind of an object or something, you know, and I went to grab on; I saw him underneath, then I pulled him out. I saw something like it fell off or jumped off; I didn't pay any attention; didn't think anybody was going to get hurt; I saw an object kind of fall down; I saw a car there and they was all scrambling; that made him knock him off or get off, I guess, I suppose. When I took hold of him he was lying on his back." After the accident the witness helped carry plaintiff on to the car.

Sam Tranin testified: "There was quite a mob of people down there waiting for the car. Well, the car came around, kind of swept away around the curve, and I could see—well, just when it was probably about ten feet away from me, I could see a man holding on to the vestibule, to the rods of the car—of course, I couldn't see whether he was standing on the steps or not, because I didn't see below, I just looked on top of the car, I could see that, I could see him fall loose from there. . . . Then Mr. Stevens started to holler, 'That man,' he says, 'just fell off of the car and got cut up,' and then Mr. Stevens ran up to pull him out. There was such a mob right around there I couldn't see what he done with him at all."

Witnesses for the defendant narrated the occurrence as follows:

Bessie Rosenthal testified: "I saw the man as the car was turning the loop; I saw a man hop on the car, and he held there, and when it turned the loop and got towards me, he went and let go, and he fell off, fell kind of on his side, on his back, and then he rolled over, and threw one hand on the track, and hit my slipper with the other hand. He fell on his back." This witness further testified that plaintiff was not unconscious before his hand was crushed, but became so afterwards. She gave as a reason for this conclusion that his eyes were open

before the injury, but were closed afterwards. She further testified that it was the rear wheel of the front truck that ran over his hand.

Mrs. H. Ankerson testified as follows: "This man jumped or caught hold of that bar of the car—that handlebar there—and it drug him along; he seemed to slip —I don't know whether he slipped or not, I can't say that, but it drug him along and just as he got in front of us he fell, and he fell over and he rolled back again, and just then, why, he threw out his hands, and I says, 'Don't throw your hand under the car'; he threw it right under the car then."

Louis Minturn testified that he saw the man jump for the steps as the car came along and saw him take hold of the handholds; then he saw the plaintiff squat down and let go of the handhold and fall forward on his back. The witness then saw plaintiff roll over and place his hand on the rail under the front trucks and then roll back on his back; that the car ran five or ten feet and then stopped.

Charles Guth, companion of the witness Minturn, testified as follows: "I noticed a man jump on the front step and grab the one handhold, and he let loose—well, he was on there just long enough to let loose, and fell off kind of back down on his back, and forward, and he rolled over and placed his hand under the wheel of the car just about the time the car was ready to stop." This witness saw the wheel run over plaintiff's hand and stated that after this occurred plaintiff "rolled over and threw his left hand in the air, the mangled hand; threw it in the air, on his back. The car was traveling about three or four miles an hour." On cross-examination the witness testified that plaintiff's shoulders hit the ground first; that the plaintiff "kind of squatted and fell back on his shoulders" and that the injured man was unconscious after the accident.

The testimony on behalf of defendant took a wide range and much immaterial testimony was introduced without any objection on the part of plaintiff. The plaintiff did not take the witness stand in person, but the

defendant offered the deposition of the plaintiff in evidence. In his deposition the plaintiff testified that along in April, 1911, he was solicited by defendant's agent to take out some accident insurance; that he had known the agent since they were boys together in high school, at Kansas City, and that he took out a policy for $5000; that the agent wanted him to take out a policy for $15,-000; that the first policy was to expire on August 1st and that on July 30th the insurance agent called on him again, told him that he was in a contest for an insurance prize and urged him to take out the additional ten-thousand-dollars insurance. The witness then took out the additional insurance and paid $15, three months' premium thereon in advance, and at the same time paid three months' back premium on the $5000 policy, and three months' advance premium on the same policy, and the agent took up the old policy to send in to the company so that a new-form policy could be issued. Afterwards, and on the same day that he took out this additional insurance, a soliciting agent of the Aetna Life Insurance Company, who had been supplying him with employer's liability insurance, called to see him and the subject of accident insurance was mentioned. The Aetna agent asked him about the policy that he was carrying, and the premium he had to pay, and told plaintiff that defendant company was charging him $10 more a year than the Aetna Company would charge him to carry the $10,000 insurance and told the plaintiff that if he would come to the Aetna office he could prove it to him. The next day the plaintiff went to the Aetna office and, after some discussion, agreed to take a ten-thousand-dollar accident policy in the Aetna Company. The premium on the Aetna policy was $10 a year less than the premium charged by the defendant company. Plaintiff told the Aetna agent that he had $15,000 in the defendant company and that he would cancel the ten-thousand-dollar policy held by the defendant company. On August 8th, plaintiff called the defendant's agent over the 'phone and told him to cancel the ten-thousand-dollar policy, but the agent said that he had already sent the applica-

tion to the company and told the plaintiff that it would cancel itself in three months. The agent, after the telephone talk, came down to the plaintiff's office and, after discussing the matter, the agent became angry and left the office and the plaintiff was also angry. Plaintiff did not tell the defendant's agent that he had, in the meantime, procured a ten-thousand-dollar policy in the Aetna Company, giving as a reason that he did not want his old schoolmate friend to feel sore. On the morning of the accident plaintiff says that he intended to go to Topeka and was down at the Union Depot and bought a ticket for Topeka, which he intended to use on the train leaving Kansas City at 4:30 p. m. About four o'clock that afternoon he started to go to the Union Depot and stopped at the Santa Fe up-town ticket office and there purchased an accident policy in the Traveler's Insurance Company, good for two days. The policy was for $2500 for loss of life and $1250 for the injury which plaintiff later suffered. Plaintiff testified that he had always been in the habit of buying accident tickets when he had to travel and that when he bought this ticket he had forgotten about having taken out the other accident policies. After the plaintiff bought the accident ticket at the Santa Fe office, he was informed by the agent that it was too late for him to catch the train for Topeka and he didn't go to Topeka that day. Later in the evening, he decided to go to Sheffield to investigate some proposed contracts for roofing, which he desired to obtain. Plaintiff was the president of the Lamport Roofing Company. After he got on the car going to Sheffield he became interested in looking over some proposed contracts that he had and the street car passed Sheffield without his knowledge. He then rode on out to Fairmount Park where he spent a portion of the evening, and started to return home about ten p. m.; that there was a crowd waiting for the car and just before the car reached him a man standing to the left of plaintiff stepped on the front step of the car and, as the car passed, plaintiff stepped up beside the man on the step. He further testified: "I was standing right up there, and I felt—could feel the people—they was so thick

there—crowding against me there, and I rode—I don't have any idea how far—it seems to me that I rode twenty feet, possibly not that far, when I was grabbed in there, right here in the side there. I was either grabbed or hit or something that took the wind out of me. I couldn't move. It just seemed to kill my feelings, and the next thing I felt or know of I felt a standing on my head. That's the way it seemed to me. I had a feeling of standing on my head. That's all I remember of, but when I got hit there it just seemed that I couldn't move a muscle. I couldn't do a thing. I just seemed to get that way. It seemed to stun me, but still I felt standing on my head, and that's all I could remember of doing."

The plaintiff did not regain consciousness until the next morning and stated that he had no idea as to how he lost his hand and that his hand was amputated before he recovered consciousness.

The plaintiff further testified that creditors were not pressing him for money at the time he was injured and that his business was prosperous; that the assets of the Lamport Roofing Company were about nine thousand dollars and that the firm owed a bank about one thousand dollars at that time.

At that time plaintiff owed a Mr. LaForce about one thousand dollars as balance on a rooming house which he had purchased and owed about forty dollars on a grocery bill; that he owned nine thousand dollars of the $15,000 capital stock of the roofing company and that he had two or three hundred dollars on deposit at the Trust Company at the time he was hurt.

He testified that he had collected the $1250 on the policy he purchased at the Santa Fe Ticket office.

It further appears from the evidence that after this accident, and on February 13, 1912, plaintiff deposited the policy here in suit with the Commerce Trust Company of Kansas City to secure an indebtedness of $9000 which he then owed the bank and which he had borrowed since the accident. It appears from the evidence that the trust company was made party plaintiff to this ac-

tion, after the suit was pending, and after the above mentioned placing of the policies as collateral security.

There was evidence tending to show that, at the time of this accident, plaintiff was the owner of a rooming house called the New Era; that he did not conduct it personally, but employed different women 'to manage the same. Some of the witnesses testified that the house was conducted along moral lines, but others said it was not. One witness said that street walkers were permitted to enter therein, with the knowledge and acquiescence of plaintiff. There was also evidence tending to show that no profits were being realized by plaintiff from this rooming house at the time of the accident. Plaintiff originally gave $1500 for the same, and was carrying about $3150 insurance on the furniture therein.

The agent of the defendant company corroborated in a way the testimony of plaintiff about the purchase of the accident insurance policies; but stated that plaintiff brought the subject up, on July 30, 1911, and that he seized the opportunity and persuaded the plaintiff to take the additional policy for ten thousand dollars and that he delivered the policy to plaintiff on August 7th, and plaintiff asked the witness if he had to keep the policy and that the agent told plaintiff that he had his money and that plaintiff had to keep the policy. This witness further testified that plaintiff never asked him to cancel the policy.

The agent for the Aetna Company testified that the plaintiff came to him inquiring about insurance and that he did not go to plaintiff and solicit the business by knocking on defendant company. He did admit, however, that he explained the advantages of the Aetna policy over the policy of the defendant company, and that plaintiff told him about his having fifteen thousand dollars of insurance in the defendant company, and said that he would refuse to take the ten-thousand-dollar policy in the defendant company when it was delivered.

The general agent of the defendant company in Kansas City testified that a few days before the accident plaintiff called at the office and asked him to explain the

double indemnity clause, which he did, telling plaintiff that if he received injuries while on the steps or any part of a car he would receive double indemnity.

A signed statement of the Lamport Roofing Company, dated June 13, 1911, and supplied by plaintiff to the Trust Company, for the purpose of securing credit for the company, showed total liabilities $2535 and total assets, $10,900.

There was also evidence tending to show that plaintiff drew fifteen dollars a week from the roofing company. This amount was drawn by each of the three general stockholders, but it appears that when any one of the three wanted more money that he drew it from the company and each of the others would draw a like amount. The evidence further tended to show that any additional profits made by the company were left in the treasury of the company and put into the company's business.

A short time prior to the accident the people near the factory of the Lamport Roofing Company complained of the smoke and fumes coming therefrom and had threatened to have the same abated as a nuisance, and it appears that after the accident, and on August 30, 1911, the plaintiff was fined fifty dollars in police court because of the smoke nuisance, and the plant was closed. Afterwards plaintiff made arrangements to move the plant to Kansas City, Kansas, and executed a contract to purchase a piece of land over there for about $6,000 and paid five hundred dollar down on same, but had never paid any further sums up until the time of the trial. Plaintiff moved his plant over to Kansas City, Kansas, and bought considerable new machinery, but it appears that at the time of the trial the plant was not being operated.

The evidence also shows that a few years before this accident plaintiff spent sometime in South Africa, trading with the natives, and that he had lived in several different places, but finally came back to Kansas City; that he had a wife living at Chicago at the time of the

accident, but that he was living with another woman in Kansas City.

The evidence further tended to show that prior to the accident the gross business of the roofing company amounted to $600 or $800 per month, but the amount of profits is not shown.

In rebuttal the book-keeper for the Lamport Roofing Company testified that she heard plaintiff tell the agent of the defendant company that he wanted to cancel the ten-thousand-dollar policy, but that the agent refused to cancel it; this occurred in the office of the roofing company, prior to the accident.

Such further facts as may be necessary to an understanding of the issues will be stated in the opinion.

I.  Appellant contends that the court erred in overruling its demurrer to the evidence offered at the close of the evidence.

In this behalf it is insisted that there was no evidence that the injury was accidental.  We are unable to agree with this contention.  There is evidence tending to show that plaintiff fell from the step of the street car, his shoulders striking the ground first.  Immediately after the accident a bruised place was discovered on the rear portion of the top of his head and plaintiff was lying on his back unconscious—his left hand crushed.  Dr. Callaghan, who was present at the scene of the accident, went to the immediate relief of the plaintiff and accompanied him to the hospital.  He testified that plaintiff was unconscious and that he did not become rational until the next morning; that he was suffering from concussion of the brain; that the injury to the hand *could not* have caused the unconscious state, but that the bruise on the head could have caused it.  Plaintiff, in his deposition, introduced in evidence by the defendant, testified that he became unconscious before his hand was injured. We are, therefore, of the opinion that there was sufficient evidence to justify the jury in finding that plaintiff was unconscious before his hand was crushed.  If that were

**Accidental or Intentional Injury.**

true he could not have *intentionally* thrust his hand under the wheel as contended by defendant. Upon a demurrer to the evidence, plaintiff is entitled to every favorable, reasonable theory or inference arising from the whole evidence. We are, therefore, of the opinion that a case was made for the jury on the issue of accidental injury.

II. It is further contended that the court erred in refusing to peremptorily instruct the jury to return a verdict in favor of defendant, as requested in its refused instructions numbered 13, 14, 15 and 16, because of the alleged false warranties made by Lamport in obtaining the insurance. We are unable to agree with this contention. Said instructions were as follows:

**Warranties.**

"13. In the policy sued on, the plaintiff Lamport warranted that one Mamie Lamport was his wife. The evidence shows that this warranty was untrue; that Mamie Lamport never was the wife of plaintiff Lamport. Your verdict will therefore be in favor of the defendant.

"14. In the policy sued on, the plaintiff Lamport warranted that his habits of life were correct. The evidence conclusively shows that this warranty was false, and your verdict will be in favor of the defendant.

"15. In the policy sued on, the plaintiff Lamport warranted that his income per week exceeded the gross amount of weekly indemnity under all policies carried by him. This warranty was false, and your verdict will be in favor of the defendant.

"16. In the policy sued on, the plaintiff Lamport warranted that he had no accident insurance issued by stock companies, except a certain policy issued by the defendant. This warranty was false and untrue, and your verdict will be in favor of the defendant."

Instruction 13 above is based upon the alleged warranty in the policy that the beneficiary named therein was the wife of the insured. The evidence, we think, unmistakably shows that the beneficiary was not the wife of the insured. However, since the very purpose of

naming a beneficiary is to designate a person who will receive the loss payment only *in the event of the death* of the insured, it is difficult to see what possible materiality that warranty could have on the validity of that portion of the policy which provides only for paying certain losses, for injuries not resulting in death, direct to the insured.

It has been held that a policy of this character, at least with reference to those portions providing indemnity for loss of life, were policies of life insurance, within the meaning of the suicide statute of this State. [Logan v. Fidelity & Casualty Co., 146 Mo. 114.]

By like reasoning such a policy or at least so much thereof as relates to indemnity for loss of life, would likewise be a ''policy of insurance on life'' within the scope of section 6937, Revised Statutes 1909, which provides that:

''No misrepresentation made in obtaining or securing a policy of insurance on the life or lives of any person or persons, citizens of this State, shall be deemed material, or render the policy void, unless the matter misrepresented shall have actually contributed to the contingency or event on which the policy is to become due and payable, and whether it so contributed in any case shall be a question for the jury.''

Under the provision of the above section the court would not be justified in giving the peremptory instruction to find for the defendant even though the representation or warranty as to the beneficiary were false, this because the jury would still have the right to say whether such misrepresentation actually contributed to the loss.

Concerning instructions 14, 15 and 16 above, it is sufficient to say that the evidence upon the issue of false warranties therein mentioned was conflicting and it cannot be said that either of the other warranties were false as a matter of law. That point alone would justify the court in refusing to give the instructions as asked. And, under such a condition, it becomes unnecessary to a determination of this case to decide whether or not the war-

ranties or representations mentioned in said instructions fall within the scope of Section 6937, supra.

III.   Neither did the court err in refusing defendant's instructions which attempted to submit to the jury the issues arising upon said warranties.   The several instructions in this behalf are quite lengthy and it would serve no useful purpose to set forth the same herein.   We have carefully examined the same and find that they do not properly instruct the jury upon those issues even if defendant's theory of the law be correct.   Furthermore said instructions assume, as true, facts which are in dispute, and contain unwarranted comments on the evidence, either of which, alone, would justify the action of the trial court in refusing the same.

*Instructions.*

IV.   We are unable to agree with appellant's contention that the court erred in refusing to give its instruction number 21.

This instruction, in effect, told the jury that the plaintiff was present in court and heard the testimony of witnesses relating his conduct and movements about the time he received the injury in question, but that he did not take the witness stand in his own behalf and that from such failure a strong presumption of law arises that his testimony, if given, would not sustain the issues upon his part.

*Plaintiff's Failure to Testify.*

Whether such an instruction would ever be proper, we have very serious doubts, but as to that we need not now determine, because such an instruction would certainly be improper in the present suit where plaintiff's testimony, in deposition form, covering about 140 pages of this record, was introduced in evidence by the defendant and considered by the jury.   This deposition took a wide range and plaintiff gave testimony, not only upon every point that might possibly relate to the issues, but also upon matters clearly outside the issues.   He explained in that deposition that he became unconscious

before his hand was injured and that he did not know how the injury was caused.

We, therefore, rule that the court did not err in refusing this instruction.

V. It is contended that the court erred in excluding the following evidence:

(1) A portion of the answer of plaintiff's wife filed in a divorce proceeding in Chicago in 1908 wherein she charged plaintiff with sexual perversion.

(2) Letters written by plaintiff to his wife in 1903, 1905 and 1906.

(3) The record of the municipal court of Chicago showing that on April 8, 1908, the plaintiff was found guilty of wife abandonment and, by said court, was ordered to pay to his wife the sum of $250 and that the plaintiff stand committed until the above sum is so paid. The record further shows that the plaintiff was, by said court, discharged on April 22, 1908.

(4) The records of the district court of Wyandotte County, Kansas, showing that a criminal action was pending therein in which plaintiff stood charged with the crime of perjury in making a false affidavit in connection with a divorce proceeding instituted by plaintiff in said court on the 14th of November, 1912.

The court did not err in excluding any of the above evidence. (1) The mere fact that plaintiff's wife, in her divorce answer, charged him with sexual perversion, would be no evidence of such fact. Furthermore even though, if upon any theory, it were held to be evidence of the existence of such a fact, we think the matter too remote for the purpose of proving plaintiff's habits of life at the time of the purchasing of this insurance and at the date of the accident. (2) We have carefully read the letters written by plaintiff to his wife in 1903, 5 and 6. They are quite lengthy. We are unable to find anything therein, the rejection of which would work a reversal of the case. (3) The judgment of the Chicago Municipal Court, in 1908, finding plaintiff guilty of wife abandonment and ordering him to

Extraneous Matters.

Lamport v. Assurance Corp.

pay his wife the sum of $250 would not tend to prove any issue in the present case. (4) The mere fact that plaintiff stood charged with the crime of perjury would be no evidence that plaintiff was in fact guilty of the charge.

These propositions appear to be so plain as to require no citation of authority.

VI. It is contended that the judgment should be reversed because the plaintiff at the request of his attorney exhibited to Dr. Callaghan, while a witness on the stand, in the presence of the jury, the stump of his mutilated arm. It appears to us that this point is frivolous. Furthermore no foundation for error was laid at the trial. The defendant's counsel objected to the exhibit and the trial court sustained the objection. No request was made by the defendant for a further ruling or action upon the part of the court in connection with the matter. It would appear that defendant did not then regard the occurrence as prejudicial to its rights because no request was made that the jury be discharged or that counsel be admonished for his conduct. The plaintiff had a right to be present at the trial of his case. And his mere presence at the trial would unavoidably exhibit to the jury the mutilated arm. The exhibition by the plaintiff of his arm to the Doctor upon the witness stand would give the jury very little information which they did not already possess, and we do not find that the occurrence would have justified a reversal of the case even though a proper foundation had been laid for preserving the error now urged.

*Exhibition of Injured Arm.*

VII. It is contended that the judgment should be reversed because of improper remarks made by plaintiff's attorney in his closing argument to the jury. We have carefully examined this assignment of error, but do not find any remarks made by counsel which would warrant a reversal of the judgment.

*Remarks of Attorney.*

VIII. It is further contended that the court should' have granted a new trial on account of the alleged mis-conduct of one of the jurors. In this behalf it is claimed that on his *voir dire* examination the prospective juror testified that he had never been in a dispute with any insurance company when the exact contrary was true.

Juror.

The present condition of the bill of exceptions does not justify a discussion of this point. The *voir dire* ex-amination of the witness is not preserved in the bill of exceptions. Upon a hearing had upon the motion for a new trial the evidence is in conflict as to what questions were asked the juror upon his *voir dire* examination. According to the juror's own sworn testimony, he made true answers to questions propounded him upon his ex-amination. The trial court who passed upon this ques-tion was present when the *voir dire* examination was had, and ruled against appellant's contention on the point now urged. Since the condition of the present rec-ord leaves in doubt just what occurred upon the *voir dire* examination, we are unable to determine whether or not the juror concealed any matter which he should have dis-closed.

The point is therefore disallowed.

IX. Other matters urged as ground for reversing the judgment are matters which are attempted to be pre-served by the filing of a supplemental mo-tion for a new trial which was filed long after the four day period had expired, and in fact after the judgment term had ended. It is well settled in this State that the appellate review of matters of exception must be confined to the matters properly preserved in a motion for a new trial filed within the four-day period prescribed by statute (Sec. 2025, R. S. 1909) and that matters attempted to be preserved by motion for a new trial or supplemental motion for new trial, filed out of time, will not be considered. [Saxton National Bank v.

Supplemental Motion for New Trial.

Bennett, 138 Mo. 494, l. c. 500; Mirrielees v. Railroad, 163 Mo. 470; State ex rel. Iba v. Ellison, 256 Mo. 644, l. c. 664, and cases therein cited.]

The judgment is affirmed.  All concur.