WILLIAM W. BOILLOT, RESPONDENT, v. INCOME GUARANTY COMPANY, A CORPORATION, APPELLANT.—83 S. W. (2d) 219.

St. Louis Court of Appeals.   Opinion filed June 4, 1935.

Appellant's Motion for Rehearing Overruled June 18, 1935.

Petition for Writ of Certiorari Denied July 30, 1935.

*Davis & Davis* for appellant.

992

*Irwin & Bushman* and *Harry L. Buchanan* for respondent.

994

SUTTON, C.—This is an action on an insurance policy issued to plaintiff, William W. Boillot, by the defendant, Income Guaranty Company, on January 3, 1930.

The policy insures "William W. Boillot of Columbia, State of Missouri, by occupation a piano tuner, under class A, against loss resulting solely from bodily injuries effected directly and independently of all other causes through accidental means." It then provides that if such bodily injuries result in the loss of life the company will pay the sum of $5000, or if such bodily injuries totally and continuously disable the insured from performing any and every duty pertaining to his occupation the company will pay a monthly indemnity of $100 for the period of such continuous total disability excepting the first thirty days of such disability, and if a disability necessitates the removal of the insured to a hospital the company will pay in addition to the monthly indemnity the amount expended monthly by him for said hospital charges, but not in excess of fifty per cent of the monthly indemnity. It also provides for the payment of indemnity for disability resulting from sickness.

In his petition plaintiff sets forth the provisions of the policy, and alleges that his occupation as stated in the policy was that of a piano tuner, and that his occupation continued as that of a piano tuner until the date of the accident which caused the injuries for which he sues; that on June 11, 1932, while said policy was in force he suffered the loss of the greater part of his right hand through the accidental discharge of a shotgun, whereby he was totally and continuously disabled from performing any and every duty pertaining to his occupation of piano tuner from the time of said accident up to the time of the filing of the petition; that from and after the date of said accident it was necessary for him to have medical and hospital treatment, and that he was moved to and confined in a hospital from the date of the accident until August 7, 1932; that defendant has failed and refused to pay plaintiff the indemnity due him for the first six months of his disability accruing after the accident, excluding the first thirty days of disability, amounting to $600, and for hospitalization from July 11, to August 7, 1932, amounting to $45; and that defendant has vexatiously and without reasonable cause refused to pay the loss.

The amended answer, on which the case was tried, consists of four paragraphs.

In the first paragraph defendant admits the provisions of the policy as alleged in the petition.

In the second paragraph defendant sets up by way of an affirmative defense certain answers alleged to be false and untrue made by plaintiff to questions in an application signed by him on which the policy in suit was issued with respect to the character of his occupation, the amount of his average monthly earnings, and the amount of additional insurance carried by him, and prays for cancellation of the policy.

In the third paragraph defendant pleads a provision of the policy that in the event the insured is injured "after having changed his occupation to one classified by the company as more hazardous than that stated in the policy, or while he is engaged in doing any act or thing pertaining to any occupation so classified, except ordinary duties about his residence or while engaged in recreation, the company will pay only such portion of the indemnity provided in the policy as the premium paid would have purchased at the rate but within the limits so fixed by the company for such more hazardous occupation," and avers that the injury sustained by plaintiff was occasioned while plaintiff was doing an act pertaining to the occupation of a hunter classified as more hazardous than that of a piano tuner as stated in the policy, and avers that if defendant is liable to plaintiff at all it is liable for only such portion of the indemnities provided in the policy as the premium paid would have purchased at the rate but within the limits fixed by the company for such more hazardous occupation. In this paragraph defendant also pleads a provision of the policy that "monthly indemnity under this policy shall be payable only for the period that the insured is regularly and personally attended at least once in each seven days by a licensed medical or osteopathic physician or surgeon," and avers that the plaintiff was not during the period of his alleged disability regularly and personally attended by a duly licensed medical or osteopathic physician or surgeon once in each seven days.

In the fourth paragraph defendant avers that the injury sustained by plaintiff was sustained while he was engaged in doing an act pertaining to the occupation of a farmer, with supervising duties only, classified as a more hazardous occupation than that of a piano tuner, and avers that if defendant is liable at all it is liable only for such portion of the indemnities provided in the policy as the premium paid would have purchased at the rate but within the limits fixed by the company for such more hazardous occupation.

The second paragraph of the answer was stricken out on motion of the plaintiff.

The trial, with a, jury, resulted in a verdict and judgment in favor of plaintiff for $718.36 for indemnity and $250 for attorney's fee and damages for vexatious refusal to pay plaintiff's claim. Defendant appeals.

Plaintiff testified as follows:

"I reside at Columbia, Missouri. My occupation, beginning in 1904 until June 11, 1932, has been tuning pianos. I have had charge of the tuning of pianos in the studios of the State university and at Stephens and Christian Colleges.

"I received an injury on June 11, 1932. I was hunting squirrels on my farm. After the injury, on the same day, I was taken to the Audrain County Hospital where I was treated by Dr. Jolley who performed two operations on my hand. By the first operation the fingers were taken off at the knuckle and it was left in that condition for three or four weeks after which there was a second operation when he cut the bones off what he called the mid-hand portion to get what he called the pad to cover the bones.

"I was hunting squirrels, heard a bark, cocked the gun, but was not able to see the squirrel, and I passed the gun to my left hand, and while circling the tree I fell on the gun and it was discharged and shot my fingers off of my right hand. The result was about half of the palm left. Also part of the last joint of the thumb was left. All the fingers are off midway across the hand.

"It has totally disabled me from following the occupation of a piano tuner for the reason that I use the tuning hammer in my right hand and I am not able now to hold it; in tuning the hand must be coordinated in their use. It is necessary to play the keys and turn the tuning pins at the same time. This I am not able to do. A tuning hammer is a wrench inserted over the head of the tuning pin. The tone of the string depends upon the tension. The change in the position of the pin changes the tension. If the tension is changed, the pitch is changed. In tuning it is necessary to strike with the key setting the string in vibration, and while it is in vibration the tuning pin is turned and brought into harmony with the other notes, which can be done only when the key is depressed. In tuning, you first remove the panels of the piano to make the tuning pins accessible. It is necessary to use both hands in tuning. I am right handed. In tuning octaves, it is necessary to strike two, which requires the outspread hand. I cannot handle the tuning hammer with my left hand or with my stub hand. I have never known anyone with one hand that was able to tune a piano.

"I was confined in the hospital one month and twenty-seven or eight days of the next month. The rate for the room was $5 a day. When I left the hospital my hand had started to heal. It was still draining quite a good deal at five joints. Dr. Jolley saw me

practically every day in the hospital except one or two days when he was absent when one of the other doctors saw me. Dr. Jolley discharged me about August 7, 1932. After that I went to Dr. Smith.

"I owned the Boillot farm since 1916 and sold it about the first of September, 1932. It consisted of 320 acres. On January 3, 1930, I had a contract with George Hampton who had charge of the place and the operation of it. I took no part in the operation. My contract with Mr. Hampton gave him the authority to operate the farm. He got his part of grain raised and I the other part. We had partnership herds of stock, of breeding cattle and hogs, and Mr. Hampton had charge of the herds. I turned over the purchasing of the stock to him.

"The accidental discharge of the gun was on June 11, 1932, on this farm. I went to the farm to see how many cows were ready to be shipped. In the neighborhood of two o'clock I left the house to hunt squirrels.

"After the third of January, 1930, my best recollection is, that I was on the farm from eight to a dozen times a year, but haven't stayed all night on the farm in three years."

Samuel Bihr testified, for plaintiff, as follows:

"I am a piano tuner and have been so engaged about forty years. You tune a piano by a hammer which pulls the pins which operate the strings. To do this it is necessary to exert an exact amount of force to a degree. It is necessary to relieve the damper upon the strings in order to get the proper tone, in doing which you use the left hand, the other in operating the hammer. All the strings are fastened into the pin and hooked around the end pin at the bottom of the piano or at the end. That is the plate. In my opinion a man with a stub of a hand like plaintiff has could not be successful in tuning a piano."

Joseph Blaser testified, for plaintiff, as follows:

"I am a piano tuner and have been so engaged twenty years. Before tuning a piano you must take off the front panel, then the fall board, then the music desk, and it is necessary to use both hands in doing this. You use both hands continually in tuning a piano, the right to manipulate the tuning pins, the left to strike the keys. In my judgment a man cannot tune a piano with one hand. In my opinion Mr. Boillot cannot tune a piano."

Defendant assigns error here upon the action of the court in striking out the second paragraph of its amended answer. There is no merit in this assignment. It is not alleged, and no facts are alleged to show, that the matters claimed to have been misrepresented by plaintiff, in his application for the policy, contributed to his injury.

Section 5732, Revised Statutes 1929, Mo. St. Ann., Sec. 5732, p. 4273, provides as follows:

"No misrepresentation made in obtaining or securing a policy of insurance on the life or lives of any person or persons, citizens of this State, shall be deemed material, or render the policy void, unless the matter misrepresented shall have actually contributed to the contingency or event on which the policy is to become due and payable, and whether it so contributed in any case shall be a question for the jury."

The provisions of this section are applicable to accident policies, such as is here in suit, as well as to ordinary life policies. [Williams v. Mutual Life of Illinois (Mo. App.), 283 S. W. 64; Lamport v. Assurance Corporation, 272 Mo. 19, l. c. 38, 197 S. W. 95; Logan v. Fidelity & Casualty Co., 146 Mo. 114, l. c. 125, 47 S. W. 948.] They apply alike to warranties and representations, and draw no distinction between innocent and fraudulent misrepresentations. [Kern v. Legion of Honor, 167 Mo. 471, 67 S. W. 252; Bruck v. John Hancock Mutual Life Ins. Co., 194 Mo. App. 529, 185 S. W. 753; Burgess v. Pan-American Life Ins. Co. (Mo.), 230 S. W. 315.] Of course, that the matter warranted or misrepresented contributed to the injury must be pleaded to make the warranty or misrepresentation available as a defense. [American Central Life Ins. Co. v. Buschmeyer (Mo. App.), 65 S. W. (2d) 959; Christian v. Connecticut Mutual Life Ins. Co., 143 Mo. 460, 45 S. W. 268.]

Manifestly the stricken pleading fails to state a good defense either at law or in equity. It was properly stricken.

Defendant assigns errors upon the refusal of its instructions Nos. 10, 11, 14 and 15, drawn on the theory that if plaintiff at the time he was injured was engaged in doing an act pertaining to the occupation of a hunter, or the occupation of a farmer, classified as more hazardous occupations than the occupation of a piano tuner, he was entitled to recover only such portion of the indemnities provided in the policy as the premium paid would have purchased at the rate but within the limits fixed by the company for such more hazardous occupation. We can see no merit in these assignments. There was no evidence that plaintiff was engaged in doing an act pertaining to either the occupation of a farmer or a hunter at the time he was injured. On the contrary, the undisputed evidence is that he was at the time engaged in hunting for recreation. There was no evidence to support the instructions, and they were properly refused. [1 C. J., 434; Southern Surety Co. v. Georgia Casualty Co. (Mo. App.), 215 S. W. 501; Business Men's Assurance Co. v. Bradley (Tex.), 275 S. W. 622; Holiday v. American Mutual Accident Assn., 103 Ia. 178, 72 N. W. 448; Accident Assn. v. Frohard, 134 Ill. 228, 25 N. E. 642; Casualty Co. v. Sheppard, 61 Kan.

351, 59 Pac. 651; Union Casualty & Surety Co. v. Goddard, 25 Ky. L. 1035, 76 S. W. 302; Kenny v. Bankers Accident Ins. Co., 136 Ia. 40, 113 N. W. 566.] It should be observed in this connection that affirmative defenses, such as this, resting upon provisions of the policy looking to the avoidance or limitation of liability under the principal clause of the policy must be pleaded, and the burden is on the insurer to prove such defenses, and not on the insured to disprove them. [Crenshaw v. Pacific Mutual Life Ins. Co., 71 Mo. App. 42; Jamison v. Continental Casualty Co., 104 Mo. App. 306, 78 S. W. 812; Wendorff v. Missouri State Life Ins. Co., 318 Mo. 363, 1 S. W. (2d) 99.]

Defendant relies on Loesch v. Union Casualty and Surety Co., 176 Mo. 654, 75 S. W. 621. In that case the insured's occupation, as described in his application for the policy in suit, was that of a stock dealer not working or tending stock in transit. The insured agreed in his application that in case of any injury received by him while exposed to hazard peculiarly incident to an occupation classified as more hazardous than that given by him as his occupation, there should be a limitation of liability to the amount of insurance that the premium would purchase in the more hazardous class. At the time of his injury plaintiff was engaged in tending stock in transit, and was in the act of untying a bull in a railroad car. The occupation of a stock dealer tending stock in transit was classified as more hazardous than that of a stock dealer not working or tending stock in transit. The court held, of course, that the insured was at the time he was injured exposed to a hazard that was peculiarly incident to an occupation which was classified as more hazardous than that named in his application, and that therefore his recovery should be limited to the amount of insurance the premium would purchase in the more hazardous class. But we have no such case as that under review here. The distinction is obvious.

Defendant assigns error for the refusal of its instruction No. 13, as follows:

"The jury is instructed that if they believe and find from the evidence that during any part of the time between July 11, 1932, and January 11, 1933, plaintiff was able to perform any part of the duties pertaining to his occupation, then plaintiff is only entitled to recover, if you should find for him, indemnity at the rate of two-fifths of the indemnity otherwise provided by the policy sued on."

The instruction is apparently based on the following provision of the policy:

"Or, if such bodily injuries, independently and exclusively of all other causes, totally and continuously disable the insured from performing one or more important daily duties pertaining to his oc-

cupation, . . . the Company will pay, for the period, of such partial disability, . . . a monthly indemnity of two-fifths of the monthly indemnity hereinbefore specified.''

The instruction is clearly erroneous. It would have told the jury, or would have led them to conclude, that if during any part of the period of disability sued for plaintiff was able to perform any part of the duties pertaining to his occupation, he was only entitled to recover indemnity of two-fifths of the indemnity otherwise provided by the policy, for the entire period of disability sued for, rather than for the period only of partial disability. It would also have left the jury unadvised concerning ''the indemnity otherwise provided by the policy.'' For these reasons, if for no other, the instruction was properly refused.

Defendant assigns error upon the refusal of its instruction No. 9, which sought to advise the jury that plaintiff could not recover any sum on account of his injuries for the time that he was not regularly and personally attended at least once in each seven days by a licensed medical or osteopatic physician or surgeon. This instruction is based on the provision of the policy that monthly indemnity shall be payable only for the period that the insured is regularly and personally attended at least once in each seven days by a licensed medical or osteopathic physician or surgeon. Defendant construes this provision of the policy literally. By so construing the provision, it becomes, under the facts of this case, unreasonable and subversive of the manifest purpose of the policy. It was shown, without a suggestion in the record to the contrary, that plaintiff was attended by a physician so long as there was any need for such attendance. After the hand was amputated and the stub had recovered from the operation further medical attendance would have been useless. To make plaintiff's recovery for his disability depend upon a mere idle formality would give the provision in question an absurd construction. The provision was never meant to serve such a purpose. [Hunter v. Federal Casualty Co., 191 N. Y. S. 474; Harasymczuk v. Massachusetts Accident Co., 216 N. Y. S. 97; National Life Ins. Co. v. Patrick, 28 Ohio App. 267; Eaid v. National Casualty Co., 122 Ore. 547.]

Defendant complains of the refusal of its instruction No. 8, which would have told the jury that the burden of proof was on the plaintiff to establish by the greater weight of the testimony that on the 11th day of June, 1932, a shotgun held by plaintiff in his left hand was accidentally discharged, and upon such discharge thereof a load of shot so discharged thereby struck him in the right hand, and that he was taken to a hospital, was discharged from the hospital, and afterwards treated by a physician, and the exact times when so treated, and unless all such facts were so established to

the satisfaction of the jury by the preponderance of the evidence they should return a verdict in favor of defendant. There was no error in the refusal of this instruction. It proposed to put the burden on the plaintiff to prove by the greater weight of the evidence many undisputed details. It was not disputed that plaintiff received a gunshot wound in his right hand on June 11, 1932, that he was taken to a hospital, and was afterwards discharged from the hospital and treated by a physician, and it was shown, without a suggestion in the record to the contrary, that the discharge of the gun was accidental. We decline to convict the trial court of error for refusing to instruct the jury that the burden was on the plaintiff to prove by the greater weight of the evidence these undisputed facts. Moreover, this instruction undertook to put the burden on plaintiff to prove by the greater weight of the evidence the exact times when he was treated by a physician. Of course, plaintiff did not have the burden of making any such exact proof.

Defendant assigns error for the exclusion of testimony offered to show that the monthly indemnity claimed by plaintiff under the policy in suit was in excess of his average monthly earnings. This assignment is based on the provision of the policy that "indemnity for disability will not be paid under this policy at a rate in excess of the average monthly earnings of the insured for the period of time that he has been actually employed during the two years immediately preceding the commencement of disability." There is no merit in the assignment. There was no offer to show that the monthly indemnity claimed by plaintiff "under this policy" was in excess of his average monthly earnings. Besides, there was no such defense pleaded. [Crenshaw v. Pacific Mutual Life Ins. Co., 71 Mo. App. 42.]

Defendant assigns error for the admission of plaintiff's testimony that he was at the time of his injury engaged in hunting for recreation. Defendant contends that this was a mere conclusion. We can see no merit in this contention. The statement of the plaintiff that he was hunting for recreation was not a conclusion but the statement of a fact. Defendant had a right to cross-examine plaintiff to test the truth of his statement, but did not see fit to do so. Nor did it introduce any evidence whatever showing or tending to show that plaintiff was ever engaged in hunting as an ocupation.

Defendant assigns error upon the refusal of its instruction No. 6, designed to withdraw from the jury the issue of vexatious refusal to pay plaintiff's claim under the policy.

Pertinent to this issue plaintiff testified as follows: "In order to secure payment of this policy I wrote the company a half dozen times, and I had a conference with Mr. Alley, the company's adjuster, early in September. I had two conferences with Mr. Alley.

The first time he called I asked him to pay what the company owed up until that time. He said he did not think I was totally disabled. He said he did not want to pay for the time I was in the hospital, that that might get to be a habit, that if we were going to have a lawsuit we would have a big one. I asked him if we might not get together under the provisions of the policy with regard to arbitration, and he said that was not to be considered, that any man they would appoint would not agree with any man I would appoint with regard to the third man. He said that I was no longer a piano tuner when I got shot, that I had changed my occupation, and was then a hunter, and was doing an act pertaining to that occupation. He spoke of prorating with regard to the loss of the hand. The policy provides that if the whole hand is lost a certain amount is due, and he said I had lost half·a hand, and half the amount might be due, to which I said that was contrary to the contract.''

Mrs. Boillot, plaintiff's wife, testified as follows:

''I was present when Mr. Alley visited my home in the latter part of September. He said he did not think my husband was totally disabled from following his occupation. He contended that my husband was a hunter. My husband said: 'Well, Mr. Alley, you mean to say you don't think I was totally disabled when I was flat on my back in the hospital? Pay me what you owe me for that time.' Mr. Alley said, 'Oh no, this thing of paying might get to be a habit.' I said, 'Well, Mr. Alley, do you mean to say to me you don't think my husband was totally disabled from following his occupation when his hand was bandaged and draining?' He said, 'No, I don't, I don't know anything about what he has to do to tune a piano.' ''

It will be observed that the adjuster refused payment on the ground that he did not regard plaintiff as totally disabled from engaging in his occupation as a piano tuner. Yet, the testimony given on the part of the plaintiff at the trial, well nigh conclusively showing that he was totally disabled, remained uncontroverted. The adjuster was also unwilling to believe that plaintiff was totally disabled while he was in the hospital and while his hand was still bandaged and draining, and refused to pay him for his total disability during that period, and threatened him with a big lawsuit. He also suggested that one-half of the indemnity allowed under the policy for the loss of the whole hand might be due in view of the fact that plaintiff had lost one-half of his hand, though there was no provision in the policy to justify such suggestion. He testified that one of his reasons for refusing payment was that he did not think there was any liability in view of the false representations made by plaintiff in his application for the policy. Yet no such defense was pleaded until just before the case was called for trial,

when an amended answer was filed, at the term of court succeeding the return term, and in that answer failed to allege that the representations complained of contributed in any way to plaintiff's injury. Another reason given by the adjuster for refusing payment was that the monthly indemnity claimed by plaintiff to be due him under the policy was in excess of his average monthly earnings for the period of two years immediately preceding the commencement of his disability. · Yet no proof of this was made or offered, and no such defense was pleaded.

Moreover, there appears to be very little, if any, merit in any of the defenses pleaded, or insisted upon at the trial.

We think vexatious refusal to pay is abundantly shown. [Exchange Bank of Novinger v. Turner (Mo.), 14 S. W. (2d) 425, · l. c. 433; Block v. United States Fidelity & Guaranty Co. (Mo.), 290 S. W. 429, l. c. 442; Curtis v. Indemnity Co. of America (Mo.), 37 S. W. (2d) 616, l. c. 628; Porter v. Equitable Life Assurance Society (Mo. App.), 71 S. W. (2d) 766; National Battery Co. v. Standard Accident Ins. Co. (Mo. App.), 41 S. W. (2d) 599; Insurance Co. v. Bommarito, 42 Fed. (2d) 53.]

Defendant assigns error upon the admission of plaintiff's testimony respecting the refusal of defendant's adjuster to arbitrate. There was no provision in the policy for arbitration. The testimony was admitted on the theory that it was competent on the issue of vexatious refusal to pay. In the absence of a provision in the policy for arbitration testimony showing a refusal to arbitrate would ordinarily not be competent. However, the testimony being admitted in connection with the testimony respecting the threat of the adjuster to subject plaintiff to the expense and delay of a big lawsuit, we think it was competent, as tending to throw light on the threat, and expose its motive, particularly in view of the fact that the refusal was put, not on the ground that there was no provision in the policy for arbitration, but on the specious ground that the two men appointed by the parties would not agree on a third man. The refusal thus put, in connection with the threat, was obviously intended to give the plaintiff to understand that there could be no escape from the harassment of a big lawsuit unless he would forego his claim or settle with defendant on its own terms. It was to forestall just this sort of enterprise that the statute penalizing vexatious refusal to. pay was enacted. .

The rest of the twenty-nine assignments of errors submitted are necessarily ruled against defendant by what we have already said, or are too general in character to require consideration.

The Commissioner recommends that the judgment of the circuit court be affirmed.

PER CURIAM:—The foregoing opinion of SUTTON, C., is adopted as the opinion of the court. The judgment of the circuit court is accordingly affirmed. *Hostetter, P. J.,* and *Becker* and *McCullen, JJ.,* concur.