# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 99-1241

———————

Larry Melvin; Patricia Melvin,

        Appellants,

v.

Yale Industrial Products, Inc.,

        Appellee.

\*
\*
\*
\*
\*   Appeal from the United States
\*   District Court for the
\*   Eastern District of Arkansas
\*
\*
\*

———————

Submitted:  September 15, 1999

Filed:   November 26, 1999

———————

Before McMILLIAN and MURPHY, Circuit Judges, and BOGUE, District Judge.[1]

———————

McMILLIAN, Circuit Judge.

     Larry Melvin ("Melvin") and his wife, Patricia Melvin (together "appellants"), appeal from a final order entered in the United States District Court[2] for the Eastern District of Arkansas granting summary judgment in favor of Duff-Norton Co., Inc.

———————

    [1]The Honorable Andrew W. Bogue, United States District Judge for the District of South Dakota, sitting by designation.

    [2]The Honorable William R. Wilson, Jr., United States District Court Judge for the Eastern District of Arkansas.

d/b/a Yale Industrial Products, Inc. ("Yale") in this action to recover insurance benefits under appellee's health care plan ("the Plan"). See Melvin v. Duff-Norton Co., Inc., Case No. H-C-98-038, (E.D. Ark. Dec. 11, 1998) (hereinafter "Order"). For reversal, appellants argue that the district court erred in holding that, in light of certain facts not genuinely disputed, Melvin's physical damages resulted from an "occupational" activity and thus did not fall within the definition of a covered "[i]njury" under the clear and unambiguous terms of the Plan. For the reasons discussed below, we affirm the order of the district court.

## Jurisdiction

Jurisdiction in the district court was proper based upon 29 U.S.C. § 1132(e) and 28 U.S.C. § 1331. Jurisdiction in the court of appeals is proper based upon 28 U.S.C. § 1291. The notice of appeal was timely filed pursuant to Fed. R. App. P. 4(a).

## Background

At the time of his plane accident, Melvin was a self-employed farmer and crop duster. See Order at 1. Melvin solely owned and operated L.M. Aerial Services, Inc. ("L.M. Aerial"), which used specialized aircraft to distribute chemicals onto farming crops for a per acreage fee. See Joint Appendix at 179 (hereinafter "App."). The exclusive business of L.M. Aerial was to provide such crop-dusting services for profit. See Order at 1.

In June 1996, the Melvin Farms Partnership hired L.M. Aerial to crop-dust three fields owned by the partnership. See App. at 169. On June 18, Melvin (as the sole employee of L.M. Aerial) had sprayed two of three fields when rain interrupted his flight and forced him to land. After the rain subsided, Melvin returned to the air for a second "run" and completed the dusting of the partnership's fields. See id. at 169-70, 173. Rather than returning directly to the landing strip, Melvin detoured over his son's

-2-

farm (approximately three miles away from the partnership's fields) and began applying "leftover" chemicals. See Order at 1. Melvin's plane crashed moments later and Melvin was seriously injured. See id.

Melvin obtained his health insurance through the group insurance plan (hereinafter "the Plan") offered by Yale, his wife's former employer. See id. Governed by the Employee Retirement Income and Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1461, the Plan does not explicitly grant to the Plan administrator the power to construe the terms of the Plan. See id. at 1-2. The stated purpose of the Plan is to provide "for the payment or reimbursement of specific medical and related expenses incurred by its eligible employees and their covered dependents." Plan at 2. Thus, when a covered Plan member incurs necessary expenses as a result of an "Illness" or "Injury" (as defined by the Plan), the Plan pays reasonable and customary charges as detailed in the schedule of benefits, unless an exclusion precludes recovery. See id. at 21-24. "Injury" (as defined by the Plan) is "only a non-occupational, not self-inflicted condition caused by accidental means which result in damage to the Covered Plan Member's body through external force which requires treatment by a Physician." Id. at 27. The Plan does not define the term "non-occupational." See Order at 2. The Plan also contains an exclusion for accidental injuries "arising out of, or in the course of, any work for wage or profit and for which benefits are, or could be, provided through Worker's Compensation, Occupational Disease law or similar legislation, and/or their respective waiting period." Plan at 22.

After the accident, Melvin made a claim under the Plan for his medical expenses resulting from the plane crash. See Order at 1. In October 1996, the Plan administrator denied the claim, stating that Melvin's injuries were not covered under the Plan and specifically citing the Plan's exclusion for injuries incurred while performing "work for wage or profit." See App. at 49. Appellants then filed suit in federal district court to recover the benefits. See Order at 1. The parties next filed cross-motions for summary judgment. See id. at 2.

-3-

Upon review, the district court held that, under the clear and unambiguous terms of the Plan, Melvin could not recover benefits as a matter of law. The district court first noted that the Plan's requirement that a covered "[i]njury" be "non-occupational" in nature. See id. Giving the term "occupational" its ordinary meaning, the district court determined that it could not genuinely be disputed that Melvin was engaged in an "occupational" activity on June 18, 1996, when his aircraft crashed. The district court accordingly concluded that Melvin's physical damages resulted from an "occupational" activity and Melvin could not recover benefits under the Plan as a matter of law. See id. at 4-5. The district court did not reach the applicability of the "work for wage or profit" exclusion. The district court granted summary judgment for Yale, and this appeal followed.

**Discussion**

We review decisions to grant summary judgment *de novo*, applying the same standards as the district court. See Regel v. K-Mart Corp., 190 F.3d 876, 879 (8th Cir. 1999). We will affirm the grant of summary judgment "if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." Id. (quoting Young v. Warner-Jenkinson Co., 152 F.3d 1018, 1021 (8th Cir.1998)).

With respect to the interpretation of an ERISA plan which does not give the administrator discretionary authority to construe the plan's terms (as in the instant case), we review the district court's interpretation *de novo*. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). Furthermore, we give the language "its common and ordinary meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words." Barker v. Ceridian Corp., 122 F.3d 628, 632 (8th Cir. 1997) (quoting Chiles v. Ceridian Corp., 95 F.3d 1505, 1511 (10th Cir. 1996) (quotations omitted)).

-4-

Appellants argue that Melvin's injuries were in fact "non-occupational" and thus fall within the Plan's definition of compensable injuries, assuming no other Plan exclusions would preclude recovery. Appellants admit that there are no cases construing the term "non-occupational" within an ERISA plan and that, accordingly, the words in the Plan should be "given their plain and ordinary meaning as understood by a reasonable, average person." Brief of Appellants at 2 (quoting Central States, Southeast & Southwest Areas Pension Fund v. Independent Fruit & Produce Co., 919 F.2d 1343, 1350 (8th Cir. 1990)).

Appellants initially contend that, even under the district court's somewhat narrow definition, Melvin's injuries are appropriately characterized as "non-occupational." Appellants cite the district court's definition of "occupation" as "a craft, trade, profession or other means of earning a living: employment, vocation." Order at 4 (quoting Webster's Third New International Dictionary 1560 (1993)). Appellants note that, although one of Melvin's "means of earning a living" was crop-dusting, Melvin was not strictly engaged in "earning a living" when he gratuitously sprayed his son's field. See Brief of Appellants at 12. Accordingly, appellants assert that Melvin's injuries cannot be characterized as "occupational" under the district court's own definition.

Alternatively, appellants argue that the meaning of "non-occupational" is ambiguous and susceptible to other reasonable interpretations. Appellants note the procedural history of the case, in which the denial of Melvin's claim initially rested on the "work for wage or profit" exclusion alone. See App. at 49. Appellants contend that the administrator's reliance on this exclusion "tacitly acknowledged that Larry Melvin's injuries met the definition of 'non-occupational'" and, at the very least, illustrated "just how cloudy the term 'non-occupational' is" on these facts. Reply Brief of Appellants at 3. Appellants also point to the parties' (and the district court's) apparent confusion over various hypotheticals at the hearing on the parties' cross-motions for summary

judgment. See id. at 4. This purported uncertainty "confirmed that 'non-occupational' is ambiguous when applied to these facts." Id. Finally, appellants note that the meaning of "occupation" in other contexts typically includes more than just a physical act and seems integrally tied to compensation. On the latter point, appellants argue that "[w]ithout some notion of payment, an occupation is no different from a hobby that someone regularly performs." Id. at 6; cf. Boillot v. Income Guar. Co., 83 S.W.2d 219 (Mo. Ct. App. 1935) (affirming judgment for piano tuner injured in hunting accident and finding that plaintiff was engaged in recreation, not occupation of hunter or farmer); 6 Lee R. Russ & Thomas F. Segalla, Couch on Insurance 3d § 86:34 (1998) (noting that "[t]he act of engaging in an activity for recreation does not constitute a change of occupation even though other persons may engage in such activity as their occupation").

Appellants assert that this ambiguity can be resolved if "non-occupational" is interpreted in light of the purposes of the Plan as a whole,[3] most especially its manifest intent to limit double recoveries. Appellants initially note the Plan's language that "[t]his Plan is not intended to duplicate benefits you are entitled to receive from other group plans, employer sponsored plans, government programs, prepaid plans . . . or any other responsible payor/party recovery." Plan at 15. The Plan also indicates that coverage is excluded for injuries "arising out of, or in the course of, any work for wage or profit and for which benefits are, or could be, provided through Worker's Compensation." Plan at 22. Against this backdrop, appellants read the term "non-occupational" as being "defined operationally by one of the Plan's animating principles," namely the prevention of double recovery for medical services. Brief of

_____

[3]Appellants recall that this Court routinely looks to the Plan as a whole and its purposes in interpreting ambiguous terms. See, e.g., Wilson v. Prudential Ins. Co. of Am., 97 F.3d 1010, 1013 (8th Cir. 1996) (noting that a court should "construe each provision consistently with the others and as part of an integrated whole so as to render none of them nugatory."); Jacobs v. Picklands Mather & Co., 933 F.3d 652, 657 (8th Cir. 1991).

Appellants at 14. Accordingly, because Melvin was not engaged in work for wage or profit when he crashed (and arguably would not have been entitled to Worker's Compensation for such injuries), Melvin's injuries are best characterized as "non-occupational." Otherwise, a person might sustain injuries that were "non-occupational" and yet still not be entitled to benefits if he or she were engaging in work for wage or profit, presumably an absurd result. See id. at 15.

We disagree with appellants and hold that the term "non-occupational" is not ambiguous as applied to the facts of this particular case. Utilizing the ordinary meaning of "occupation" (for which the district court's dictionary definition seems a fair approximation), we do not doubt that Melvin was practicing his occupation when he dusted his son's field for free. As the district court noted, Melvin's actions on the day of the accident were "directly related to his occupation and employment as a crop duster." Order at 5. As he dusted his son's field, Melvin used his employer's plane as well as other tools of his trade, including the "leftover" crop-dusting chemicals. See id. Melvin also utilized his specialized training and license to perform such aerial application. See id.

Appellants' claim that "non-occupational" is ambiguous as applied to these facts is unsupported. Although the Plan administrator denied Melvin's claim without explicitly relying on the "non-occupational" term in the Plan's "Injury" definition, see App. at 49, we attach little significance to this fact. Instead, we must construe the disputed language "without deferring to either party's interpretation" unless the plan language specifies otherwise. Wallace v. Firestone Tire & Rubber Co., 882 F.2d 1327, 1329 (8th Cir. 1989) (quoting Firestone Tire & Rubber Co v. Bruch, 489 U.S. 101, 112 (1989)).

Regarding appellants' analogies to the insurance context where certain recreational activities have been deemed "non-occupational," we note that such recreational activities are distinguishable in character from Melvin's in the present case.

In <u>Boillot v. Income Guar. Co.</u>, 83 S.W.2d 219, the sole case cited by appellants, the injured party was not actually engaged in his own professional activities as Melvin was here. Thus, our holding does not muddy the clear distinction between occupational and recreational tasks.[4] Moreover, we are not persuaded that compensation is "integrally linked" to an understanding of "occupation."[5] Although charitable crop-dusting may be more atypical in the professional experience, we remain convinced that Melvin was engaged in an "occupational" activity at the time of his accident.[6]

Analysis of the term "non-occupational" in the context of the Plan as a whole does not alter our position. The Plan clearly sets up a two-stage process for determining benefits coverage: (1) the Plan pays a covered Plan member's necessary

---

[4]<u>Cf.</u> 6 Lee R. Russ & Thomas F. Segalla, <u>Couch on Insurance 3d</u> § 86:19 (1998) ("Questions and representations pertaining to 'occupation' ordinarily refer to the insured's general, regular employment or vocation, as distinguished from a temporary and independent activity or avocation.").

[5]For example, lawyers and doctors often engage in their professional duties on a pro bono basis and yet are still bound by professional standards of conduct. <u>See, e.g.</u>, ABA Model Rules of Professional Conduct Rule 1.1 ("A lawyer shall provide competent representation to a client."), Rule 6.1 ("A lawyer should aspire to render at least (50) hours of pro bono publico legal services per year.") (1996); AMA Code of Med. Ethics Opinion E ("A physician shall be dedicated to providing competent medical service with compassion and respect for human dignity."), Opinion E-9.065 ("Each physician has an obligation to share in providing care to the indigent . . . . Physicians are meeting their obligation, and are encouraged to continue to do so, in a number of ways such as seeing indigent patients in their offices at no cost or at reduced cost . . . .") (1996).

[6]As to the alleged confusion over several hypotheticals at the hearing on the parties' cross-motions for summary judgment, we read the hearing transcript to indicate that the district court and the parties were merely trying to discern the line between "occupational" and "non-occupational" injuries in a thorough and reasoned fashion. <u>See</u> App. at 232-35. This inquiry in and of itself does not confer ambiguity to the term "non-occupational."

expenses incurred as a result of an "Illness" or "Injury" as defined by the Plan, provided (2) no Plan exclusions or limitations apply.  In other words, to receive benefits under the Plan, a Plan member must fully satisfy the threshold qualification before reaching the applicability of any exclusions.  Appellants' attempt to conflate the meaning of "non-occupational" with that of the "work for wage or profit" exclusion ignores this basic tiered structure.  As appellee argues, the terms were clearly not intended to have the same meaning, or else one single term would have been used throughout the Plan.  See Brief of Appellee at 13.  Instead, the term "non-occupational" defines a broad range of compensable injuries and the "work for wage or profit" exclusion limits recovery for particular types of injuries.[7]  See id.  Melvin's failure to satisfy the threshold requirement for a "non-occupational" injury precludes recovery in this instance.

Because we agree with the district court that Melvin's damages did not result from a covered "Injury," we need not comment on the applicability of the "work for wage or profit" exclusion.

## Conclusion

We affirm the order of the district court.

---

[7]With this understanding, appellants' anomalous result of exclusion for a "non-occupational" injury is not as absurd as once implied.  As Yale correctly notes, it is "not uncommon for farmers, crop dusters, musicians or lawyers to perform some physical activity apart from their occupation for which they receive compensation."  Brief of Appellee at 13.  In such situations, the "work for wage or profit" exclusion might apply, if benefits could also be provided through Worker's Compensation.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.