Timothy A. COSTLEY, Plaintiff,

v.

THIBODEAU, JOHNSON & FERIANCEK, PLLP, and David M. Johnson and J.D. Feriancek, individually and in their capacity as Trustees, Defendants.

No. CIV.01–602 (RLE).

United States District Court, D. Minnesota.

Feb. 27, 2003.

Eric J. Braaten, Eagan, MN, for Plaintiff.

Mark A. Fredrickson, Minneapolis, MN, for Defendants.

## MEMORANDUM ORDER

ERICKSON, United States Magistrate Judge.

### I. *Introduction*

This matter came before the undersigned United States Magistrate Judge pursuant to the consent of the parties, as authorized by Title 28 U.S.C. § 636(c), upon the Defendants' Motion for Summary Judgment and for Attorney's Fees. At a Hearing on the Motions, the Plaintiff Timothy A. Costley ("Costley") appeared personally, and by Eric J. Braaten, Esq., and the Defendants Thibodeau, Johnson & Feriancek, PLLP ("the Law Firm"), David M. Johnson ("Johnson"), and J.D. Feriancek ("Feriancek"), both individually, and in their capacities as Trustees, appeared by Mark A. Fredrickson, Esq. For reasons which follow, we grant the Defendants' Motion for Summary Judgment, but deny their Motion for Attorney's Fees.

### II. *Factual and Procedural History*

Costley was formerly a partner in the Law Firm, which was formed on January 1, 2000. See, *Complaint*, at ¶ 8. Prior to that time, the four named partners worked together in another firm—Johnson, Killen, Thibodeau & Seiler, P.A. ("Johnson Killen").

In July of 2000, the partners of the Law Firm began discussing whether to adopt a retirement or pension plan. See, *Ex. D,* attached to *Affidavit of Diane B. Bratvold* ("Bratvold Aff.")(notes of partnership meeting on July 19, 2000). In that process, they met with advisors—LeRoy Kolquist ("Kolquist"), an accountant, and Brian Liberty ("Liberty"), a financial advisor with U.S. Bancorp/Piper Jaffray—in order to create such a plan. *Id.* (notes of partnership meeting on August 24, 2000, and September 11, 2000, referencing discussions with Kolquist and Liberty). There were a number of meetings, between the partners and Kolquist, as well as one or two meetings with Liberty. See, *Affidavit of LeRoy Kolquist,* at ¶ 2 ("Kolquist Aff."); *Affidavit of Brian Liberty,* at ¶ 1 ("Liberty Aff."); *Deposition of Timothy Costley,* at 44–52, *Ex. C to Bratvold Aff.* ("Costley Depo.").

One of the issues, which was addressed in the meetings with Kolquist, was the ability of Thomas Thibodeau ("Thibodeau") to be exempted from the Plan, as he was not interested in participating in the Plan, since he was close to retirement age. See, *Affidavit of Timothy A. Costley,* at ¶ 6 ("Costley Aff."); *Costley Depo.,* at 29–30, 34, 40–41. Apparently, Kolquist advised the partners that everyone in the Law Firm had to participate in the retirement or pension plan, and therefore, another solution was needed in order to ensure that Thibodeau vested as soon as possible. See, *Costley Aff.,* at ¶ 7; *Costley Depo.,* at 34–35.

All of the partners in the Law Firm, including Thibodeau, had a five-year employment contract, extending to December 31, 2004. See, e.g., *Employment Agreement for Thomas R. Thibodeau, Ex. E to Bratvold Aff.* ("Thibodeau Employment Agreement"); *Costley Depo.,* at 33. At the end of the five-year contract, Thibodeau would be sixty-two years old. See, *Affida-vit of Thomas R. Thibodeau,* at ¶ 3 ("Thibodeau Aff."). In order to ensure that Thibodeau could retire, and be fully vested at the time of retirement, the partners, and Kolquist, began discussing alternative scenarios. Apparently, they did discuss the "Vesting Service" box, which is at the crux of this case, but Kolquist thought it would be "useless." *Kolquist Aff.,* at ¶ 6; *Costley Depo.,* at 45–46. Costley asserts that the partners specifically spoke to Kolquist about using prior years of service at Johnson Killen for the purposes of vesting, *Costley Depo.,* at 44–45, but Kolquist does not recall such a conversation, *Kolquist Aff.,* at ¶¶ 9–10. Rather, in regard to the "Vesting Service" box at issue, Kolquist wrote in his notes, "I feel does not apply because firm is only 10 mos. old [therefore] won't help Tom T." *Ex. 1 to Kolquist Aff.* According to Kolquist, the note "was made in reference to the fact that checking 'yes' would not address the issue of having Tom Thibodeau vested within the five-year contract." *Kolquist Aff.,* at ¶ 8.

Eventually, as to the Thibodeau situation, Kolquist suggested that the partners make the "normal retirement age," under the retirement or pension plan, sixty-two— at which time a participant would be fully vested. *Kolquist Aff.,* at ¶ 5; see also, *Costley Depo.,* at 52–53. In fact, Johnson recalls confirming the advice with Liberty, who observed that the Law Firm could make the "normal retirement age" even lower. *Johnson Aff.,* at ¶ 3. Since Thibodeau would be sixty-two at the end of his five-year contract, the Defendants claim that the "normal retirement age" designation, at sixty-two, solved the Thibodeau situation.

According to Costley, however, the "normal retirement age" approach was only a partial solution, as Thibodeau's employment contract allowed him to decrease his work load, after the third year of the

contract. See, *Costley Depo.*, at 29–30, 43–44; *Ex. A to Thibodeau Employment Contract.*[1] Therefore, in order to allow Thibodeau to obtain his retirement funds as soon as possible—perhaps as early as 2003, when he had the option to reduce his work load, Costley contends that the partners discussed whether they could use their years of service at Johnson Killen to satisfy the required years of vesting service. *Costley Aff.*, at ¶¶ 8–9; *Costley Depo.*, at 44–45. As already noted, Costley maintains that the partners specifically asked Kolquist if they could count their years of service at Johnson Killen to help Thibodeau vest, prior to the normal six years, but that Kolquist said that would not work. *Costley Aff.*, at ¶ 10; *Costley Depo.*, at 44–45. All of the Defendants, as well as Kolquist and Liberty, deny such a discussion, however. *Kolquist Aff.*, at ¶¶ 9–10 ("None of my meeting notes, or any other document I maintained regarding the adoption of the Plan, refers in any way to the phrase 'years before the Employer first maintained the Plan' as including years of service with a former law firm."); *Liberty Aff.*, at ¶ 5; *Affidavit of J.D. Feriancek*, at ¶ 4 ("Feriancek Aff."); *Affidavit of David M. Johnson*, at ¶ 4 ("Johnson Aff."); *Thibodeau Aff.*, at ¶ 5.

Eventually, on December 15, 2000, the Law Firm established a "Retirement Plan for Businesses and Professionals" ("the Plan"). See, *Ex. B to Bratvold Aff.* ("Adoption Agreement"); *Ex. 1 to Affidavit of Doreen A. Mohs* ("Plan Document"). The Plan was made retroactive to the date the Law Firm was created—January 1, 2000. *Adoption Agreement*, at Section B. Vesting under the Plan was "graded," with the percentage of vesting increasing as the years with the Law Firm increased, and with a participant becoming 100% vested after six or more "years of service."[2] *Adoption Agreement*, at Section D. Costley, Johnson, and Feriancek, were designated as the Trustees of the Plan. *Adoption Agreement*, at Section B.

Liberty met with the trustees of the Plan on December 15, 2000, in order to complete the final Adoption Agreement. *Liberty Aff.*, at ¶ 2; *Costley Depo.*, at 58. Liberty recalls advising the Trustees that, by checking "yes" in the "vesting service" box, they would ensure that the year 2000 counted toward the vesting schedule. *Liberty Aff.*, at ¶ 3. He further recalls advising that no vesting would occur based upon service prior to the year 2000. *Id.* In fact, both Feriancek, and Johnson aver, that

---

1. Thibodeau's employment contract provides, in pertinent part, as follows:

 The salaries of all of the parties will be subject to pro rata reduction in the event that the revenue of the firm is insufficient to cover other operating expenses. Salaries shall not be subject to reduction in order to pay debt to the attorneys. It is further subject to:

 (1) Thibodeau's right to scale back his work following an initial three-year period; however, if Thibodeau's gross collected receipts in any calendar year are below $300,000, his base salary in the subsequent year shall be reduced by the same amount, and Thibodeau shall reimburse the firm after year five for any gross collected receipt deficit in year five; and

 (2) a minimum billable and collectible hour standard of 1,750 hours applicable to Thibodeau and the others, except as these obligations may be altered by the acceptance of contingency fee cases and/or the inability of the firm to generate sufficient work and revenue to meet these obligations.

 *Ex. A to Thibodeau Employment Contract.*

2. A Plan participant's "vested" benefit refers to the portion of his or her normal retirement benefit which is "nonforfeitable," or unconditional, and legally enforceable, against the Plan. *See, Title 29 U.S.C. § 1002(19);* see also, *Jefferson v. Vickers, Inc.*, 102 F.3d 960, 963 (8th Cir.1996)("Under the terms of ERISA, a 'vested right' is one that is 'nonforfeitable.' "), citing *Title 26 U.S.C. § 411(a)(2).*

they believed that, by checking the "yes" box, they were ensuring that the entire year 2000 counted for vesting purposes. *Feriancek Aff.*, at ¶ 6; *Johnson Aff.*, at ¶ 6.

In contrast, Costley does not recall any conversation with Liberty, at the meeting on December 15, 2000, regarding checking the "yes" box for "vesting service" in order to ensure that the entire year of 2000 counted toward vesting. *Costley Depo.*, at 70–71. He similarly denies any such discussion with Kolquist. *Id.* at 71. Rather, Costley asserts that, prior to, or at the meeting with Liberty on December 15, 2000, he and Feriancek discussed whether they should still attempt to include prior years of service at Johnson Killen for vesting service, "so that Mr. Thibodeau would be immediately vested and could access his funds at the end of three years, or earlier if we bought out his partnership interest sooner than his contract provided." *Costley Aff.*, at ¶ 12; see also, *Costley Depo.*, at 43–45, 47, 49–52, 55, 62–63. In particular, Costley remembers the meeting as follows:

A. I don't recall if it was Brian [Liberty] or his assistant or it might have even been David [Johnson], but somehow somebody went—had looked through the plan, and I remember the conversation at the table saying this should work under the terms of the pension plan, meaning—this meaning that prior years of service would work.

Q. Prior years of service with a different law firm?

A. With a different firm, that it would work. We had gone through the thing with Mr. Kolquist. I don't know if he didn't like the idea, didn't think it would work, but I remember there was discussions about that, that that might not be the option to the six-year vesting problem, so we might have to find something else to do. Then in the interim, before Brian showed up in the office, we had come to the conclusion that it would work.

17. Okay.

A. That's why we told Brian to check yes for years of service.

*Costley Depo.*, at 50–51.

Costley further testified as follows:

Q. And what was your basis for Mr. Liberty knowing that what you wanted was the prior years of service with the Johnson Killen firm to be included as prior years of service?

A. Conversations with him or—I mean, I don't know how to . . .

Q. Okay. So that was a specific conversation you had with him as you're filling out the form, at least when you came to this question?

A. When we got to—right. And like I said, I don't recall that there was any in-depth conversation with Brian at that point, because Brian acted more as just kind of a draftsman, although—like I stated earlier, I—I don't know if it was Brian or David or it might have even been myself that decided that we can do this prior years of vesting service and that it will work. We must have had the plan documents, because somebody had the idea that we could do it, and that's how we decided when we got there "Let's try it."

Q. But you don't know specifically who that person was that concluded you could do it?

A. I honestly don't. Like I said, it could have been me. We had a lot of conversations about what we were going to do, and—I mean, it was two years ago. It wasn't some-

thing that I would specifically try and remember.

*Id.* at 62–63.

Costley specifically recalled Feriancek saying:

Well, what are we going to do with this? Let's just have the prior years of service vesting in there, and if it works it works.

*Id.* at 47; see also, *Costley Aff.*, at ¶ 13.

Thus, when Liberty asked the Trustees whether the "yes" box for "vesting service" should be checked, Costley recalls that "Mr. Feriancek and I looked at each other and, based upon our prior conversation, Mr. Feriancek said 'yes.'" *Costley Aff.*, at ¶ 14. Costley believes that Johnson shared this intention, but he did not recall a specific conversation with Johnson. *Costley Depo.*, at 48.

After the Law Firm adopted the Plan, Liberty met with the firm employees to explain the Plan provisions. *Liberty Aff.*, at ¶ 6. He advised that the vesting schedule under the Plan worked the same for all employees, partners and staff alike. *Id.* In fact, Denise Maslowski, an employee at the Law Firm, who had also been employed at Johnson Killen, recalled speaking with Liberty, and recalled Liberty stating "that the year 2000 was the first year that would count toward vesting in the new law firm's Plan." *Affidavit of Denise Maslowski*, at ¶ 2. She also recalled being informed "that all employees, attorneys and staff, would be treated the same under the Plan." *Id.* at ¶ 4.

On February 16, 2001, Costley resigned his employment with the Law Firm. *Complaint*, at ¶ 12; *Costley Aff.*, at ¶ 15. Upon his resignation, he demanded that the Defendants transfer the amounts allocated to him under the Plan, which approximated $24,300.00. *Complaint*, at ¶¶ 12–13. Costley believed that he was entitled to the funds because he had six years of service, including the five years he had worked at Johnson Killen, and the one

year he worked at the Law Firm. *Costley Aff.*, at 18. The Defendants refused, however, because they concluded that he did not meet the vesting requirements of the Plan, as he had only worked at the Law Firm for a little over one year. *Johnson Aff.*, at ¶ 5; *Feriancek Aff.*, at ¶ 5. In fact, according to Liberty, Johnson or Feriancek called Liberty, and explained Costley's demand, but Liberty advised them that he did not believe that Costley was vested under the terms of the Plan. *Liberty Aff.*, at ¶ 7.

Costley then brought this lawsuit against the Defendants. Specifically, in Count I of his Complaint, Costley alleges that he has been denied benefits in accordance with the Plan, thereby violating the Employee Retirement Income Security Act, Title 29 U.S.C. § 1132(a)(1)(B)("ERISA"). In Count II, he contends that, under ERISA, the Defendants owe him a fiduciary duty, which they breached by failing to distribute the contributions that had been allocated to him under the Plan. Costley also claims, in Counts III and IV, that if the Plan was not an ERISA plan, then the Defendants breached a unilateral contract, under Federal and State common law. However, Counts III and IV were dismissed, pursuant to the Defendants' previous Motion to Dismiss. See, *Costley v. Thibodeau, Johnson & Feriancek, PLLP*, 189 F.Supp.2d 938, 944–45 (D.Minn.2001). The Defendants have now moved for Summary Judgment on the remaining claims in Costley's Complaint.

### III. *Discussion*

#### 1. *The Defendants' Motion for Summary Judgment.*

1. *Standard of Review.* Summary Judgment is not an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique profi-

ciencies of a Jury in weighing the evidence, and in rendering credibility determinations. See, *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary Judgment is appropriate when we have viewed the facts, and the inferences drawn from those facts, in a light most favorable to the nonmoving party, and we have found no triable issue. See, *Luigino's, Inc. v. Peterson*, 317 F.3d 909, 911 (8th Cir.2003); *Duffy v. McPhillips*, 276 F.3d 988, 991 (8th Cir.2002); *Schoolhouse, Inc. v. Anderson*, 275 F.3d 726, 728 (8th Cir.2002); *Krentz v. Robertson Fire Prot. Dist.*, 228 F.3d 897, 901 (8th Cir.2000). For these purposes, a disputed fact is "material," if it must inevitably be resolved, and the resolution will determine the outcome of the case, while a dispute is "genuine," if the evidence is such that a reasonable Jury could return a Verdict for the non-moving party. See, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Herring v. Canada Life Assurance Co.*, 207 F.3d 1026, 1029 (8th Cir.2000); *Austin v. Minnesota Mining and Mfg. Co.*, 193 F.3d 992, 995 (8th Cir.1999); *Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir.1998); *Peter v. Wedl*, 155 F.3d 992, 996 (8th Cir.1998).

As Rule 56(e) makes clear, once the moving party files a properly supported Motion, the burden shifts to the nonmoving party to demonstrate the existence of a genuine dispute. In sustaining that burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial." *Rule 56(e), Federal Rules of Civil Procedure*; see also, *Anderson v. Liberty Lobby, Inc., supra* at 256, 106 S.Ct. 2505; *Allen v. Entergy Corp.*, 181 F.3d 902, 904 (8th Cir.1999); *Jaurequi v. Carter Mfg. Co.*, 173 F.3d 1076, 1085 (8th Cir.1999).

Moreover, the movant is entitled to Summary Judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett, supra* at 322, 106 S.Ct. 2548; see also, *Hammond v. Northland Counseling Ctr., Inc.*, 218 F.3d 886, 891 (8th Cir.2000); *Greer v. Shoop*, 141 F.3d 824, 826 (8th Cir.1998). No genuine issue of fact exists in such a case, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett, supra* at 323, 106 S.Ct. 2548; see also, *Bell Lumber and Pole Co. v. United States Fire Ins. Co.*, 60 F.3d 437, 441 (8th Cir.1995); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 510 (8th Cir.1995); *Settle v. Ross*, 992 F.2d 162, 163 (8th Cir.1993).

2. *Legal Analysis.* In seeking Summary Judgment, the Defendants claim that their decision to deny Costley benefits was a reasonable exercise of their discretion, or was otherwise in accordance with the unambiguous provisions of the Plan. The Defendants also seek to have Johnson and Feriancek, who are being sued in their individual capacities, and well as in their capacities as Trustees of the Plan, dismissed from the action. Costley does not oppose the dismissal of Johnson and Feriancek, see, *Plaintiff's Memorandum in Response to Defendants' Motion for Summary Judgment*, at 2 n. 1, and therefore, we grant their Motion for Summary Judgment on that basis. Costley does oppose the Defendants' first assertion, as he claims that the unambiguous provisions of the Plan support his contention that he is entitled to his benefits, and that we should grant Summary Judgment to him.

By way of a legal backdrop, "ERISA requires that employee benefit

plans be established by a written instrument." *Hughes v. 3M Retiree Medical Plan*, 281 F.3d 786, 790 (8th Cir.2002), citing *Title 29 U.S.C. § 1102(a)(1);* see also, *Barker v. Ceridian Corp.*, 122 F.3d 628, 633 (8th Cir.1997). As a consequence, "any promise to provide vested benefits must be 'incorporated, in some fashion, into the formal written ERISA plan.'" *Barker v. Ceridian Corp.*, supra at 633, quoting *Jensen v. SIPCO, Inc.*, 38 F.3d 945, 949 (8th Cir.1994), cert. denied, 514 U.S. 1050, 115 S.Ct. 1428, 131 L.Ed.2d 310 (1995). As our Court of Appeals has repeatedly observed:

> We look to the law of trusts when interpreting ERISA plan documents. *Jensen*, 38 F.3d at 950. "The terms of trusts created by written instruments are 'determined by the provisions of the instrument as interpreted in light of all the circumstances and such other evidence of the intention of the settlor with respect to the trust as is not inadmissible.'" *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 112, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), quoting Restatement (Second) of Trust § 4 cmt. d (1959). Other evidence is admissible if the language of the plan provision at issue is ambiguous.
>
> That intent [of the settlor] is first sought by careful examination of the trust clause in question, giving the words in that clause their ordinary meanings. If the construction question cannot be resolved by reference to the clause alone, the court will examine the entire trust instrument to determine the creator's intent and purposes * * *. The third step becomes necessary when the intent or meaning of the settlor * * * cannot be determined by reference to the provisions of the trust instrument itself. Extrinsic evidence will be admitted by the court to assist it in determining the meaning and effect of the particular clause.

*Hughes v. 3M Retiree Medical Plan, supra* at 790, quoting George C. Bogart, *The Law of Trusts & Trustees*, § 182 (rev.2d ed. 1979 & Supp.1993); see also, *Barker v. Ceridian Corp. supra* at 633; *Jensen v. SIPCO, Inc., supra* at 949–50.

■ In short, absent an ambiguity, which is intrinsic to the plan, extrinsic evidence is not admissible in construing the plan's provisions. See, *Stearns v. NCR Corp.*, 297 F.3d 706, 712 (8th Cir. 2002)("If a[n] [ERISA plan] provision is facially ambiguous, or if it conflicts with other plan provisions, the court in resolving a dispute over vesting may look at extrinsic evidence to determine whether the parties intended to confer vested retirement * * * benefits."); *Petersen v. E.F. Johnson Co.*, 2002 WL 31898160 at * 1 (D.Minn., December 26, 2002)("To resolve ambiguities in ERISA plans, courts look outside the four corners of the plan.").

Here, Costley challenges the Trustees' denial of his claim for benefits and, as a threshold matter, the parties disagree as to the standard of review which should apply to the Trustees' decision. We first address that issue, and then proceed to an analysis of the operative provisions of the Plan.

a. *The Appropriate ERISA Standard of Review.* The parties advance opposing arguments as to the appropriate standard which should govern our review of the Defendants' decision to deny Costley's request for benefits under the Plan. While both parties appear to concede, that the Plan itself gives discretionary authority to the Trustees to interpret the Plan, Costley urges that *de novo* review is necessary because the Trustees have an inherent conflict of interest.

■ Although ERISA does not, itself, prescribe the appropriate standard of review for evaluating a benefit determination under an ERISA plan, the Supreme Court, in *Firestone Tire and Rubber Co. v.*

*Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), held that "a denial of benefits challenged * * * is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." See, *Meyer v. Duluth Bldg. Trades Welfare Fund,* 299 F.3d 686, 689 (8th Cir.2002); *Milone v. Exclusive Healthcare, Inc.,* 244 F.3d 615, 618 (8th Cir.2001); *House v. Paul Revere Life Ins. Co.,* 241 F.3d 1045, 1048 (8th Cir.2001); *McGarrah v. Hartford Life Ins. Co.,* 234 F.3d 1026, 1030 (8th Cir.2000); *Ravenscraft v. Hy–Vee Employee Ben. Plan and Trust,* 85 F.3d 398, 402 (8th Cir.1996); *Cooper Tire & Rubber Co. v. St. Paul Fire & Marine Ins. Co.,* 48 F.3d 365, 371 (8th Cir.1995); *Bounds v. Bell Atlantic Enters. Flexible Long–Term Disability Plan,* 32 F.3d 337, 339 (8th Cir.1994); *Lutheran Med. Ctr. v. Contractors Health and Welfare Plan,* 25 F.3d 616, 620 (8th Cir.1994). Accordingly, when the plan does not vest in its administrators, the authority to exercise discretion, "the court undertakes a *de novo* review of the plan's terms and other manifestations of the parties' intent." *Gruenke v. Miles, Inc., Welfare Plan,* 872 F.Supp. 652, 658 (D.Minn. 1995); *Whiteside v. Metropolitan Life Ins. Co.,* 798 F.Supp. 1380, 1385 (D.Minn.1992).

■ In contrast, under an abuse of discretion standard, "the plan administrator's plan construction will be upheld, if reasonable." *Buttram v. Central States, S.E. & S.W. Areas Health and Welfare Fund,* 76 F.3d 896, 901 (8th Cir.1996); see also, *House v. Paul Revere Life Ins. Co.,* supra at 1048 ("Under the abuse-of-discretion standard, we must determine whether a reasonable person could have reached the same decision."); *McGarrah v. Hartford Life Ins. Co.,* supra at 1031. Our Court of Appeals has "variously defined an abuse of discretion as being 'extremely unreasonable,' 'virtually' the same as arbitrary and

capricious, and 'extraordinarily imprudent.'" *Shell v. Amalgamated Cotton Garment,* 43 F.3d 364, 366 (8th Cir.1994).

■ In determining whether an interpretation is a reasonable exercise of discretion, the Court is to consider:

1. Whether the interpretation is consistent with the goals of the Plan;

2. Whether the interpretation renders any language in the Plan meaningless or internally inconsistent;

3. Whether the interpretation conflicts with the substantive or procedural requirements of the ERISA statute;

4. Whether the administrators have interpreted the words at issue consistently; and,

5. Whether the interpretation is contrary to the clear language of the Plan.

*Finley v. Special Agents Mutual Benefit Ass'n, Inc.,* 957 F.2d 617, 621 (8th Cir. 1992); see also, *Wald v. Southwestern Bell Customcare Med. Plan,* 83 F.3d 1002, 1007 (8th Cir.1996) (applying *Finley* factors).

As our Court of Appeals has explained, "[t]his highly deferential standard reflects the fact that courts are hesitant to interfere with the administration of a pension plan." *Maune v. IBEW, Local No. 1, Health and Welfare Fund,* 83 F.3d 959, 962–63 (8th Cir.1996), quoting, *Cox v. Mid–America Dairymen, Inc.,* 13 F.3d 272, 274 (8th Cir.1993).

As already noted, the parties appear to agree that the Plan gives the Trustees the discretion to interpret the provisions of the Plan, and therefore, that an abuse of discretion standard of review would ordinarily apply. Moreover, even if there were a disagreement regarding the Trustees' discretion, the Plan clearly provides the Trustees with discretionary authority. In pertinent part, the Plan provides as follows:

8.1.1. Employer. The Employer is the administrator of the Plan for purposes

of section 3(16)(A) of the Employee Retirement Income Security Act of 1974. It has full responsibility for controlling and managing the operation and administration of the Plan. * * *

\* \* \* \* \* \*

8.2.4. General Powers. The Fund will be held in trust by the Trustee in accordance with the terms of the Plan Document. The Trustee will have the exclusive authority and discretion to manage and control the assets of the Fund * * *.

\* \* \* \* \* \*

8.4. Claims Procedure. The Trustee will resolve disputes and dispose of claims arising under the Plan, as described below. In carrying out its Plan responsibilities, the Trustee shall have discretionary authority to construe the terms of the Adoption Agreement, Plan Document and all other pertinent documents.

*Plan Document,* at 28–30.

These provisions afford the Trustees of the Plan the discretionary authority to determine eligibility for benefits, *id.* at 8.2.4, and for that purpose, the authority to construe the terms of the Adoption Agreement. *Id.* at 8.4.

Specifically, because the Plan provides that "the Trustee shall have discretionary authority to construe the terms of the Adoption Agreement, Plan Document and all other pertinent documents," and since the Plan squarely invests the Trustees with the power to construe the Adoption Agreement, we find that the Trustees plainly have the discretion to construe any uncertain terms, or provisions, in connection with the distribution of benefits. Therefore, the Plan gives the Trustees the discretion to construe the Plan, and we would normally review their decision under an abuse of discretion standard.

■ Nonetheless, Costley argues that a *de novo* standard of review should still apply because of an alleged conflict of interest. In circumstances where an administrator or fiduciary is operating under a conflict of interest, the "degree of deference to accord such a decision will be decreased on a sliding scale in proportion to the extent of conflict present, recognizing the arbitrary and capricious standard is inherently flexible." *Barnhart v. UNUM Life Ins. Co.,* 179 F.3d 583, 587 (8th Cir.1999); see also, *Delta Family-Care Disability and Survivorship Plan v. Marshall,* 258 F.3d 834, 840 (8th Cir.2001); *Heaser v. The Toro Co.,* 247 F.3d 826, 833–34 (8th Cir.2001); *Sahulka v. Lucent Tech., Inc.,* 206 F.3d 763, 768 (8th Cir. 2000); *Woo v. Deluxe Corp.,* 144 F.3d 1157, 1162 (8th Cir.1998)("[T]he evidence supporting the plan administrator's decision must increase in proportion to the seriousness of the conflict or procedural irregularity."). In fact, in certain circumstances, the Court may consider a conflict of interest to be so egregious that a *de novo* review is necessary.[3] See, e.g., *Da-*

---

**3.** The Court, in *Davolt v. The Executive Committee of O'Reilly Automotive,* 206 F.3d 806, 809 (8th Cir.2000), appears to have left the door open for the *de novo* review of decisions where there is a particularly egregious showing of a conflict of interest. As the Court stated, "[i]f * * * the record reveals evidence of a conflict of interest or that the plan administrator is acting 'with an improper motive,' we review the plan administrator's discretionary decision de novo." *Id.,* quoting *Armstrong v. Aetna Life Ins. Co.,* 128 F.3d 1263, 1265–66 (8th Cir.1997). As the Court later observed, however, "[t]he kind of conflict and improper motive that provoked de novo review in *Armstrong,* where the claims reviewers themselves apparently received direct personal financial benefits for rejecting claims, is different in kind from the sort of background conflict created by the mere fact that the same company is both the plan administrator and plan insurer." *Schatz v. Mutual of Omaha Ins. Co.,* 220 F.3d 944, 946 n. 5

*volt v. The Executive Committee of O'Reilly Automotive*, 206 F.3d 806, 809 (8th Cir. 2000).

 Merely providing evidence that the administrator, or fiduciary, has some financial interest in the plan is not sufficient, however. See, *Barnhart v. UNUM Life Ins. Co., supra* at 588–89. "A plan administrator's decision will be afforded less deference if a claimant presents 'material, probative evidence demonstrating that (1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty to her.'" *Phillips–Foster v. UNUM Life Ins. Co.*, 302 F.3d 785, 795 (8th Cir.2002), quoting *Woo v. Deluxe Corp., supra* at 1160. "The second prong requires demonstrating how a conflict of interest or serious procedural irregularity caused a serious breach of the administrator's fiduciary duty," which is done "by showing that the conflict or irregularity has a connection to the 'substantive decision reached.'" *Barnhart v. UNUM Life Ins. Co., supra* at 588–89, citing *Woo v. Deluxe Corp., supra* at 1161. "The need to show a serious breach of fiduciary duty 'presents a considerable hurdle for plaintiffs.'" *Phillips–Foster v. UNUM Life Ins. Co., supra* at 795, quoting *Barnhart v. UNUM Life Ins. Co., supra* at 588 n. 9.

In support of his position, that there was a palpable conflict of interest in this case, Costley points out that the Employer under the Plan, the Law Firm, which consisted of the four partners, including the Trustees, was also the Plan Administrator.

Moreover, Feriancek and Johnson are both Trustees of, and participants in, the Plan. Further, they are also two of the higher paid participants in the Plan, and there were only about ten participants in the Plan, in 2000, overall. See, *Ex. F to Bratvold Aff.* ("Pension & Profit Sharing" spreadsheet attached to Defendants' Response to Plaintiff's Request for Production of Documents). Therefore, Costley argues, the Trustees will financially benefit from their decision to deny Costley his benefits since, under Section 5.1.3 of the Plan, the non-vested portion of his benefits would be likely to revert back to the Plan. *Plan Document*, at 17 ("Disposition of Non–Vested Accounts").

Our Court of Appeals has determined that, in certain instances, the structure of a Plan can create a conflict of interest. See, e.g., *Schatz v. Mutual of Omaha Ins. Co.*, 220 F.3d 944 (8th Cir.2000). As the Court stated, in *Schatz*, "[a]s a general matter, when the insurer [of an ERISA qualified plan] is also the administrator, we have recognized something akin to a rebuttable presumption of a palpable conflict of interest." *Id.* at 947–48. The Court's reasoning for this rebuttable presumption was that, when an insurer of a plan is also a plan administrator, it has a "direct financial benefit when it denies a claim." *Barnhart v. UNUM Life Ins. Co., supra* at 587.

 Given these guidelines, we conclude that Costley has not satisfied the first prong of the test to obtain a less deferential standard of review.[4] At least at the time that they denied Costley's claim for benefits, Feriancek and Johnson did not

---

(8th Cir.2000). Thus, it appears that there is a potential category of cases which, in light of the type of conflict, will require *de novo* review. See also, *Morgan v. Contractors, Laborers, Teamsters, and Engineers Pension Plan*, 287 F.3d 716 (8th Cir.2002)("[T]he Trustees did not objectively analyze the evidence that was presented at the hearing and their decision was not a product of proper judgment and reflection based upon that evidence[,]" and, as such, "[w]e hold that these circum-

stances require us to review the Trustees' decision to deny benefits de novo.").

4. As we must, given the regimen of Rule 56, we have facially accepted Costley's assertion that Johnson, and Feriancek, were conflicted in rendering a decision on Costley's ERISA claim. Nonetheless, an equally plausible argument could be raised that, being in precisely the same position as Costley, vis-à-vis the vesting of retirement benefits, Johnson and

have a direct financial interest in that determination. Rather, given their interpretation of the Plan, they, too, had not worked at the Law Firm long enough to satisfy the vesting requirements. In fact, no participant in the Plan was vested at the time that the Trustees' denied Costley's claim for benefits. Consequently, if Feriancek, Johnson, or any other employee or partner, were to leave the Law Firm prior to working for two to six years, they, too, would forfeit some, if not all, of the non-vested portion of their benefits. As such, they had no financial interest in the Plan at the time that they made their decision as to Costley. They only had a theoretical, prospective interest in the Plan.

We recognize, as Costley argues, that both Feriancek and Johnson could potentially incur a liquidated damages charge of $100,000.00 if they were to leave the Law Firm prior to the conclusion of their five year contract. See, *Ex. E to Bratvold Aff.* As a result, Costley asserts that there would be little possibility that either Feriancek, or Johnson, would decide to leave the firm prior to becoming fully vested in the Plan. The liquidated damages provision of the contract does not automatically apply, however. Rather, under the contract, if Feriancek or Johnson decided to leave the Law Firm, prior to the expiration of their contract, they could do so, without paying the liquidated damages charge, if they received the written consent of the remaining partners. *Thibodeau Employment Contract*, at Section 7. Additionally, such damages would not apply if "the party does not engage in the practice of law in Minnesota or Wisconsin for a period of at least three consecutive years after departing," "is under a disability that substantially limits the lawyer's ability to practice law with the firm," or "accepts a position as a judge, or a judicial officer." *Id.* Thus, the incentive to stay, which is invoked by the liquidated damages clause, is mitigated by the exceptions to that clause.

As such, since Feriancek and Johnson were not vested, or even close to vesting in the Plan, at the time that they denied Costley's claim for benefits, we conclude that they did not have a direct financial interest in that decision. Moreover, there is no intimation, let alone evidence, that there were any procedural irregularities in the decision making process. Consequently, we conclude that Costley has not shown that a conflict of interest, requiring a less deferential standard of review, should apply in this case.[5]

Feriancek made a determination that was contrary to their own best interests, as they would have vested, with the addition of their years at Johnson Killen, as would have Costley. Indeed, if they were truly similarly situated to Costley in this respect, then it would appear that they would have gained more by granting Costley's claim, than denying it. Nevertheless, we examine the existence of a conflict, and its potential impact on the applicable standard of review, giving every benefit to Costley.

5. Given our determination, with respect to the first prong of the conflict of interest test, we need not reach the second prong. *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1160 (8th Cir. 1998). Nonetheless, we do note that Costley has averred as follows:

While we were negotiating the terms of my resignation from the law firm, Mr. Johnson indicated to me that he believed I was vested in the plan and that they would offer me at least a portion of my retirement benefits. One or two days later I received an evening telephone call at home from Mr. Johnson to further discuss the terms of my resignation. Mr. Johnson offered a portion of my vested benefits. I rejected his offer and reiterated my belief that I was entitled to the entire vested amount. In response to my objection, Mr. Johnson became upset and told me that he obviously had a vested interest in denying me the pension funds and that he thought I should reconsider his offer of settlement.
*Costley Aff.*, at ¶ 16.

Therefore, we turn to the Trustees' decision, as viewed under the abuse of discretion standard.

b. *The Trustees' Determination.* "When construing the language of an ERISA plan we begin by examining the language of the plan documents." *Bond v. Cerner Corp.*, 309 F.3d 1064, 1067 (8th Cir.2002), quoting *DeGeare v. Alpha Portland Indus.*, 837 F.2d 812, 816 (8th Cir. 1988), vacated and remanded, 489 U.S. 1049, 109 S.Ct. 1305, 103 L.Ed.2d 575 (1989).[6] As the Court explained, in *Barker v. Ceridian Corp., supra* at 637–38:

> Courts have a duty to interpret different clauses of a contract in a harmonious fashion, giving meaning to all clauses where possible.
>
>> [A]n elementary rule of contract interpretation is that a contract should be construed so as to give effect to all the contract's provisions. Similarly, if two clauses of a contract appear to be in conflict, the preferred interpretation is the one that gives a harmonious interpretation to the clauses in

In addition to the fact that these statements are potentially not admissible under Rule 408, Federal Rules of Evidence, as it appears that Costley and Johnson were speaking about settling Costley's claim for benefits, and releasing him from his contract with the Law Firm, we also conclude that the statement is of little import.

As Trustees, and as lawyers, it could not have escaped either Johnson, or Costley, that an amicable resolve of Costley's benefit claim would save the Plan, and Costley, the expenses of litigation, absent one or the other obtaining a "fee shift." As a fiduciary of the Plan, Johnson would have an understandable interest in minimizing those expenses amicably, if he could. Nor could it have escaped either of them that Johnson remained a Trustee of the Plan after Costley left the firm. What is missing in Costley's scenario of "a serious breach" is that Johnson could do nothing without Feriancek, and no suggestion is made that Feriancek encouraged a settle-

order to avoid rendering either one nugatory.

*Johnson Controls, Inc. v. City of Cedar Rapids*, 713 F.2d 370, 374 (8th cir.1983) (citation and quotation omitted). When reading plans "each provision should be read consistently with the others and as part of an integrated whole. Further, the terms must be construed so as to render none of them nugatory and to avoid illusory promises."

[Citing and quoting, *DeGeare v. Alpha Portland Indus., supra* at 816].

■ "Furthermore, we give the language 'its common and ordinary meaning as a reasonable person in the position of the [plan] participant, or the actual participant, would have understood the words.'" *Melvin v. Yale Industrial Products, Inc.*, 197 F.3d 944, 947 (8th Cir.1999), quoting *Barker v. Ceridian Corp.*, supra at 632, quoting in turn, *Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1511 (10th Cir.1996). "Accordingly, our inquiry begins with the written plan documents." *Hughes v. 3M Retiree Medical Plan, supra* at 790.

ment. Moreover, the reality of this case is that the result will be all or nothing to Costley, and the Plan. A consideration of settlement, in that context, would seem unavoidable. Lastly, there is no claim that Johnson sought to extort a benefit the Plan would not otherwise have, as Costley refused the offer of settlement, and his entitlement to a benefit was not beyond cavil.

6. Our Court of Appeals has explained, on several occasions, that the vacating, and remanding of *DeGeare v. Alpha Portland Indus.*, 837 F.2d 812 (8th Cir.1988), vacated and remanded, 489 U.S. 1049, 109 S.Ct. 1305, 103 L.Ed.2d 575 (1989), did "not affect the contract interpretation principles discussed in the central part of DeGeare and thus, the basic contract interpretation principles of DeGeare still apply." *Barker v. Ceridian Corp.*, 122 F.3d 628, 638 n. 7 (8th Cir.1997), citing *Howe v. Varity Corp.*, 896 F.2d 1107, 1109 n. 4 (8th cir.1990).

The Plan provisions, which are relevant to the Motion for Summary Judgment, are as follows:

## SECTION 1
## DEFINITIONS

\*　　\*　　\*　　\*　　\*　　\*

1.2. Adoption Agreement. "Adoption Agreement" means an original or amended adoption agreement (# 001 or # 002) for the Plan Document, which has been completed by the Employer and accepted by the Prototype Sponsor. \* \* \*

1.3. Affiliate. "Affiliate" means a business entity which is under "common control" with the Employer or which is a member of an "affiliated service group," as those terms are defined in Code section 414(b), (c) and (m). A business entity which is a predecessor to the Employer shall be treated as an Affiliate if the Employer maintains a plan of such predecessor business entity or if, and to the extent that, such treatment is otherwise required by regulations under Code section 414(a). A business entity shall also be treated as an Affiliate if, and to the extent that, such treatment is required by the regulation under Code section 414(*o*).

\*　　\*　　\*　　\*　　\*　　\*

1.13. Employer. "Employer" means the corporation, partnership, proprietorship or other business entity which establishes or amends a Plan by completing an Adoption Agreement and returning it to the Prototype Sponsor. \* \* \* A partnership is treated as the Employer of each of its partners.

\*　　\*　　\*　　\*　　\*　　\*

1.17. Hours of Service. "Hours of Service" means a measure of an Employee's service with the Employer and all Affili-

ates, as determined for a given computation period under the following rules \* \* \*.

\*　　\*　　\*　　\*　　\*　　\*

1.30. Vesting Service. "Vesting service" means a measure of an Employee's service with the Employer and its Affiliates (stated as a whole number of years) which is equal to the number of computation periods during which the Employee has at least 1,000 Hours of Service, subject to the following rules: \* \* \*

(c) Pre–Plan Service. If the Employer so elects in the Adoption Agreement, Vesting Service will be credited (under the rules of this Plan Document) for computation periods before the Employer first maintained the Plan (or a predecessor plan). Otherwise, such prior computations periods shall be disregarded.

\*　　\*　　\*　　\*　　\*　　\*

## SECTION 5
## VESTING

5.1.1. General Rule. Each Participant's Regular Account will become Vested under the rules specified in the Adoption Agreement.

5.1.2. Automatic Vesting. Notwithstanding any rules specified in the Adoption Agreement, each Participant's Regular Account will become fully (100%) Vested upon the occurrence of any of the following events while he or she is and Employee of the Employer and its Affiliates:

(a) Death,

(b) Disability,

(c) Attainment of Normal Retirement Age,[7]

---

7. "Normal Retirement Age," under this particular Plan, is sixty-two years of age. See, *Adoption Agreement*, at Section D.

(d) A partial termination of the Plan which affects the Participant, or

(e) A complete termination of the Plan or a complete discontinuance of Employer contributions to the Plan.

\* \* \* \* \* \*

SECTION 13

MISCELLANEOUS

\* \* \* \* \* \*

13.3 Interpretation of Plan Document. In interpreting the Plan Document and administering the Plan, there will be no discrimination in favor of Highly Compensated Employees (as defined below), the occurrence of which would adversely affect the qualification of the Plan under Code section 401(a). \* \* \*

"Highly Compensated Employee" means an individual described as such in Code section 414(q). Unless otherwise provided in Code section 414(q), each Employee who meets one of the following requirements is a "Highly Compensated Employee": .

(1) The Employee was a 5% owner (as defined in Code section 414(q)(2) at any time during the current Plan Year or the 12–month period preceding the current Plan Year \* \* \*).[8]

*Plan Document*, at 1–2, 4, 6, 17, 36.

Under the terms of the Adoption Agreement, the Plan's Vesting Rules rely on Graded Vesting, which produces the following percentages of vesting:

| Years of Service | Vesting Percentage |
| --- | --- |
| Less than 2 | 0% |
| 2 but less than 3 | 20% |
| 3 but less than 4 | 40% |
| 4 but less than 5 | 60% |
| 5 but less than 6 | 80% |
| 6 or more | 100% |

*Adoption Agreement, at Section D.*

The Defendants argue that their interpretation of the Plan was reasonable, and that, under an abuse of discretion standard, their construction must be upheld. In the alternative, they assert that, even under a *de novo* standard of review, in accordance with the plain language of the Plan, Costley was not vested, at all, at the time of his resignation from the Law Firm, as he had only worked a little over one year for the firm.

Costley similarly argues that the Plan is unambiguous, but he contends that, under the plain language of the Plan, his service at Johnson Killen is counted toward his vesting service. In particular, he points to a portion of the Adoption Agreement where the Defendants checked the "yes" box for the following question:

Vesting Service: Will vesting service include years before the Employer first maintained the Plan (or a predecessor plan)?

*Id.*

Thus, because the Plan was deemed effective on the day that the Law Firm was established, Costley contends that the Law Firm would not have checked the "yes" box if it had not intended previous service, at Johnson Killen, to count towards "vesting service." Consequently, Costley believes that he is entitled to his benefits,

---

8. Title 26 U.S.C. § 414(q)(2) provides that "[a]n employee shall be treated as a 5–percent owner for any year if at any time during such year such employee was a 5–percent owner (as defined in section 416(i)(1)) of the employer." In turn, Title 26 U.S.C. § 416(i)(1) provides that, when an employer is not a corporation, such as in the circumstances of this case, a "5–percent owner" is "any person who owns more than 5 percent of the capital or profits interest in the employer." According to the partnership meeting notes for December 12, 2000, the Law Firm divides their profits as follows: Thibodeau, 34.2%; Johnson, 24.3%; Feriancek, 20.6%; Costley, 20.9%. See, *Ex. D to Bratvold Aff.*

and he also seeks a grant of Summary Judgment. In the alternative, should we conclude that the Plan is ambiguous, he asserts that there are genuine issues of material fact, concerning the partners' intent in forming the Plan, which would preclude the grant of Summary Judgment to either party.

As we have explained, under an abuse of discretion standard, "the plan administrator's plan construction will be upheld, if reasonable." *Buttram v. Central States, S.E. & S.W. Areas Health and Welfare Plan, supra* at 901. In determining whether an interpretation is a reasonable exercise of discretion, the Court is to consider:

1. Whether the interpretation is consistent with the goals of the Plan;

2. Whether the interpretation renders any language in the Plan meaningless or internally inconsistent;

3. Whether the interpretation conflicts with the substantive or procedural requirements of the ERISA statute;

4. Whether the administrators have interpreted the words at issue consistently; and,

5. Whether the interpretation is contrary to the clear language of the Plan.

*Finley v. Special Agents Mutual Benefit Ass'n, Inc., supra* at 621; see also, *Wald v. Southwestern Bell Customcare Med. Plan, supra* at 1007 (applying *Finley* factors).

The first, third, and fourth *Finley* factors, have no real bearing on this case, as the only expressed goal of the Plan was to obtain tax benefits, which was not affected by the Trustees' determination;[9] there is no allegation that the Trustees' interpretation of the Plan conflicts with any substantive or procedural requirement of the ERISA statute; and, Costley's demand for benefits was the first instance in which the Trustees' were called upon to interpret the Plan. As such, we turn to the remaining two factors, which are the crux of the dispute before us.

The focus of the parties' contentions relates to whether the Trustees' interpretation of the Plan renders any language in the Plan meaningless, or internally inconsistent, and whether it is contrary to the clear language of the Plan. See, *Finley v. Special Agents Mutual Benefit Ass'n, Inc., supra* at 621. Our analysis, under the two factors, is intertwined, and therefore, we address them together.

Both parties assert that their respective interpretations of the Plan give full effect to the entire Plan, and that their interpretations are consistent with the clear language of the Plan. As we previously determined, in regard to the Defendants' Motion to Dismiss, the Plan itself does not specifically prohibit counting years of service with Johnson Killen in determining vesting service.[10] In particular, Section

---

9. It appears that there was a secondary "goal" of the Plan. As Costley himself concedes, part of the reason for making vesting under the Plan graded was "to give current and new employees at the firm an incentive to continue their employment with the firm." *Costley Aff.*, at ¶ 5. In fact, as Kolquist stated, "[o]ne of the common reasons for a vesting schedule is to provide an incentive for employees to continue working for the same employer." *Kolquist Aff.*, at ¶ 11. Clearly, given the fact that the Law Firm wanted to encourage its employees to remain with the firm, the Trustees' decision to interpret the vesting provisions of the Plan, so as to include only the years of service with the Law Firm, comports with that goal.

10. Since the time of the Motion to Dismiss, the parties' arguments have been modified, and clarified, considerably, and we have had occasion to consider intervening law. The key distinction between our analysis here, and that which proceeded on the Motion to Dismiss, is what significance we can extend to Costley's extrinsic evidence. Under Rule 12(b)(6), some allegations of a Complaint may have a different appearance, than when the issues are more fully briefed, and honed, under Rule 56.

1.30(c) of the Plan provides as follows: Pre–Plan Service. If the Employer so elects in the Adoption Agreement, Vesting Service will be credited (under the rules of this Plan Document) for computation periods before the Employer first maintained the Plan (or a predecessor plan). Otherwise, such prior computation periods shall be disregarded.

*Plan Document,* at 6.

Given this language, Costley maintains that, by checking the "yes" box as to "Vesting Service," the intent was to count previous years of service, with Johnson Killen, for the purpose of vesting.

Moreover, according to Costley, if, by checking the "yes" box for "Vesting Service," the Trustees, including Costley, did not intend to count previous service with Johnson Killen, then there is an internal inconsistency in the Plan, as there would be no reason to check the "yes" box if the previous service with Johnson Killen was not to be considered. More specifically, Costley contends that previous service with the same employer in this case, the Law Firm, was not possible because the Law Firm was created on January 1, 2000, and, although the Plan was signed on December 15, 2000, its effective date was January 1, 2000. See, *Adoption Agreement,* at Section D. Therefore, as urged by Costley, checking the "yes" box, as to "Vesting Service," would be useless under the Defendants' interpretation, and would render that clause nugatory.

In contrast, the Defendants allege that they checked the "yes" box in order to ensure that the entire year of 2000 was counted for vesting purposes. Their reason for doing so was that, although the Plan was made effective on the date that the Law Firm was created—that is, on January 1, 2000—the question, to which the "yes" responded, specifically asked whether "Vesting Service [would] include years before the Employer first **main-**

**tained** the Plan (or a predecessor plan)." *Id.* [emphasis added]. The Defendants contend that there is a difference between when the Plan was first "maintained," and when it was "effective," which caused them to check the "yes" box, assertedly at the behest of Kolquist and Liberty. See, *Feriancek Aff.,* ¶ 6; *Johnson Aff.,* at ¶ 6.

■ Quite plainly, there is a significant dispute as to the Trustees' intent in checking the "yes" box, under "Vesting Service." Costley contends that the Trustees never even considered whether "effective" equated with "maintained" in the Plan, and that the Trustees decided to check the box because they wanted to ensure that previous service, with Johnson Killen, was counted for vesting purposes. Johnson and Feriancek urge just the opposite— there never was a discussion regarding counting previous service at Johnson Killen, for purposes of vesting, and they specifically checked the "yes" box for "Vesting Service" because, at the behest of Liberty and Kolquist, they wanted to ensure that the entire year 2000 counted for vesting purposes. Both sides encourage us to consider extrinsic evidence, so as to address the issue of intent, but, given the trust principles, under which we are to construe ERISA plans, as well as the principles of contract law, which guide that construction, we may not resort to such evidence unless we find an ambiguity in the language used. "A term is ambiguous if it irreconcilably conflicts with other terms in the contract." *Christianson v. Poly–America, Inc.,* 2002 WL 31421684 at * 3 (D.Minn., October 25, 2002), citing, among other authorities, *Barker v. Ceridian Corp., supra* at 635, and *Jensen v. SIPCO, Inc., supra* at 949. We find no ambiguity at play here.

■ When reviewing the Trustees' decision, under the abuse of discretion standard, the key question is whether their

interpretation was reasonable. As a part of that review, we must look to whether the Trustees' interpretation conflicts with the plain language of the Plan, or whether it renders any provision in the Plan unnecessary. In this case, when the Plan is read as a whole, it is clear that the Trustees' determination does not conflict with the plain language of the Plan, and that it does not irreconcilably conflict with any other provision of the Plan.

In contrast to Costley's suggestion, no provision of the Plan is rendered meaningless, or unnecessary, by the Defendants' interpretation of the Plan. Although the Plan was made effective as of the date the Law Firm was established—January 1, 2000, see, *Adoption Agreement*, at Section B—the "Vesting Service" question referenced any service prior to the time that the Employer "maintained" the Plan. *Id.* at Section D. "Maintained" does not equate with "effective." Rather, according to the dictionary, "maintain" has the following meanings:

> 1: to keep in an existing state (as of repair, efficiency, or validity): preserve from failure or decline (~ machinery) 2: to sustain against opposition or danger: uphold and defend (~ a position) 3: to continue or persevere in: CARRY ON, KEEP UP (couldn't ~ his composure) 4a: to support or provide for (has a family to ~) b: SUSTAIN (enough food to ~ life) 5: to affirm in or as if in argument: ASSERT (~ed that the earth is flat).

*Merriam–Webster's Collegiate Dictionary* at p. 700 (10th ed.2001).

> In contrast, "effective" means:
>
> 1a: producing a decided, decisive, or desired effect b: IMPRESSIVE, STRIKING (a gold lamé fabric studded with ~ * * * precious stones—Stanley Marcus) 2: ready for service or action (~ manpower) 3: ACTUAL (the need to increase ~ demand for goods) 4: being

in effect: OPERATIVE (the tax becomes ~ next year) 5: of a rate of interest: equal to the rate of simple interest that yields the same amount when the interest is paid once at the end of the interest period as a quoted rate of interest does when calculated at compound interest over the same period—compare nominal.

*Id.* at p. 367.

As employed in the Plan, and as would be understood "by a reasonable person in the position of a plan participant," the date that the Plan is "maintained" relates to the funding, or sustaining of the Plan, while the "effective" date of the Plan relates to when the Plan becomes operative, or goes into effect. Here, the Plan was not funded, or maintained, until December of 2001, while the Plan was retroactively made effective as of January 1, 2001. As such, the two terms are not synonymous, and the Trustees' interpretation does not render the "Vesting Service" provision extraneous or meaningless. This is not to say that a legal interpretation of the Plan required the checking of the "yes" box, but where, as here, the question could arise, among Plan participants, as to whether the period, between the "effective" date and the date on which the Plan was first "maintained," would count toward vesting, this provision makes that period of vesting expressly clear.

Moreover, the Trustees' interpretation also comports with the remainder of the Plan. Under the plain terms of the Plan, "Vesting Service" is defined as the employee's "hours of service" with the Employer, and its Affiliates. "Hours of Service" only contemplates an employees' "service with the Employer and all Affiliates." Clearly, Costley has not completed enough "hours of service" with the Employer—the Law Firm. Furthermore, Johnson Killen could not be an "Affiliate," as there is no asser-

tion, by Costley, that the two firms are under "common control,"[11] or that Johnson Killen is a predecessor to the Law Firm, as the Law Firm "does [not] maintain[ ] a plan of such predecessor business entity." Finally, there is no allegation that some other statutory provision makes Johnson Killen an "Affiliate." Indeed, Costley can legitimately make no such argument, as there is no portion of the Plan which so much as mentions Johnson Killen.[12]

In addition, the Trustees' interpretation is concordant with another provision of the Plan, which would have been violated given Costley's recollection of the asserted intention to check the "yes" box. Specifically, four of the five individuals, who had previously worked at Johnson Killen—Thibodeau, Costley, Feriancek, and Johnson—would be considered "highly compensated employees," as they apparently agreed to each share more than 5% of the profits of the Law Firm. See, *Ex. D to Bratvold Aff.* (meeting notes recollecting approval of profit sharing percentages for the partners as follows: Thibodeau, 34.2%; Johnson, 24.5%; Feriancek, 20.6%, and Costley, 20.9%). As such, by counting prior service

at Johnson Killen, the Trustees would be treating all of the "highly compensated employees" disparately with all but one of the remaining six employees. Thus, if the Trustees had interpreted the Plan to include prior years of service with Johnson Killen, for purposes of vesting service, then they would have violated Section 13.3 of the Plan.

As a consequence, when read as a whole, we conclude that the Trustees' interpretation of the Plan does not render any provision of the Plan meaningless, and is consistent with the Plan language. Of course, in finding no ambiguity in the Plan language, we necessarily extend less deference to the Trustees' interpretation, as the determination as to whether a contract term is ambiguous, or not, "is a question of law." *Hughes v. 3M Retiree Medical Plan*, 134 F.Supp.2d 1062, 1068 n. 12 (D.Minn.2001), aff'd, 281 F.3d 786 (8th Cir.2002), citing *Lehman Bros. v. Clark Oil & Refining Corp.*, 739 F.2d 1313, 1317 (8th Cir.1984); see also, *Cooper v. Lakewood Eng'g & Mfg. Co.*, 874 F.Supp. 947, 953 (D.Minn. 1994) (holding that, when a contract term is unambiguous, its interpretation is a question of law). Here, we conclude that

---

11. The only named partner with the Law Firm who was also a partner at Johnson Killen is Thibodeau.

12. To exalt the "yes" box, over all the other provisions of the Plan which make Costley's interpretation untenable, by equating Johnson Killen as an "Employer," does violence to the principles of contract law which we have detailed, and which govern our interpretation of the Plan provisions. In addition, it would permit the "oral modification of employee welfare plans governed by ERISA, a result manifestly in conflict with the intent of the statute and with the case law governing it." *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 660 (8th Cir.1992); see. also, *Walker v. Nat'l City Bank of Minneapolis*, 18 F.3d 630, 634 (8th Cir.1994), citing *Title 29 U.S.C. § 1102(a)(1)*; *Paul Revere Life Ins. Co. v. VandenPlas*, 1992 WL 320994 at *6 (D.Minn.,

October 27, 1992) ("If the wording of employee benefit plans is unambiguous, ERISA precludes recovery based on oral modifications of such plans.").

Most of Costley's arguments, for committing such violence, are long on advocacy, and short on substance. As but one example, Costley provides no explanation as to why prior service at Johnson Killen should be credited for vesting—in the absence of any provision in the Plan which would recognize Johnson Killen as an "Employer"—while a Plan participant's prior service at some other law firm than Johnson Killen would not. Rather, Costley suggests that, if another Plan participant wanted to make such a claim, then the Plan language would be ambiguous, but not as to Costley. *Plaintiff's Memorandum*, at pp. 17–18. To characterize the argument as a semantic gloss is purely understatement.

the Trustee's interpretation is not only reasonable, but it is the proper interpretation as a matter of law. Accordingly, the Defendants Motion for Summary Judgment is granted.

■ B. *The Defendants' Motion for Attorney's Fees.* The Defendants have also requested that the Court award them Attorney's Fees for having to defend against this action. The applicable provision is Title 29 U.S.C. § 1132(g)(1), which provides as follows:

> In any action under this subchapter (other than an action described in paragraph 2) by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.

Generally, only the prevailing party can receive an award under Section 1132. See, *Bittner v. Sadoff & Rudoy Indus.,* 728 F.2d 820 (7th Cir.1984). Further, as noted in the language of the statute, such an award is discretionary. See, *Maune v. IBEW, Local No. 1, Health and Welfare Fund, supra* at 964; *Jacobs v. Pickands Mather & Co.,* 933 F.2d 652, 659 (8th Cir.1991). As the Court, in *Jacobs,* elaborated:

> In exercising its discretion, a Court should consider the following factors: "(1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy the award of attorney's fees; (3) whether an award of attorney's fees against the opposing parties could deter other persons acting under similar circumstances; (4) whether the parties requesting attorney's fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions."

*Jacobs v. Pickands Mather & Co., supra* at 659, quoting *Lawrence v. Westerhaus,* 749 F.2d 494, 495 (8th Cir.1984).

These are not factors which are to be mechanically applied but, rather, we are to "use the factors and other relevant considerations as general guidelines for determining when a fee is appropriate." *Martin v. Arkansas Blue Cross & Blue Shield,* 299 F.3d 966, 972 (8th Cir.2002), cert. denied, —— U.S. ——, 123 S.Ct. 967, 154 L.Ed.2d 893 (2003). Our Court of Appeals has recently clarified, however, that there is no presumption in favor of awarding fees to a prevailing party. *Id.*

■ On the Record presented, we conclude that this is not an appropriate occasion for the award of attorney's fees. First, we have no evidence that Costley was motivated by bad faith in bringing this cause of action, although his belated concession, that he did not wish to maintain actions against Johnson, and Feriancek, in their individual capacities, does give us pause. Nonetheless, he ultimately acceded to their dismissal. Further, Costley appears to have been strongly influenced by his recollection of extrinsic events, which we have found to be legally irrelevant under the circumstances presented here. Although we find his interpretation of the Plan provisions, which are here at issue, to be implausible, and legally without merit, his proffered interpretation is not wholly without an arguable basis. Simply put, Costley can be wrong without being in bad faith.

Moreover, other than the Defendants' bald assertions, we are presented with no evidence that Costley is positioned, financially, to satisfy an award of attorney's fee. A facile award of fees against an ERISA claimant could chill the Statutes salutary remedial purposes, which would cause us great concern. While deterrence of frivolous lawsuits is warranted, here Costley's claims survived a Motion to Dismiss, albeit in a dialectic that was not as focused, and informed, as the parties advanced on the

cross-Motions for Summary Judgment. Nor can we say that this litigation "resolve[s] a significant question regarding ERISA itself." While the Defendants position "sought to benefit all participants and beneficiaries of an ERISA plan," in that it was designed to protect the integrity of the Plan, the same may be said in any case involving a denial of ERISA benefits.

In sum, while the issue is somewhat close, we find that an award of attorney's fee would be an inappropriate exercise of our discretion, on the facts presented, and therefore, we deny the Defendants' request for attorney's fees.

NOW, THEREFORE, It is—

ORDERED:

1. That the Defendants' Motion for Summary Judgment [Docket No. 19] is GRANTED.

2. That the Defendants' Motion for Attorney's Fees [Docket No. 19] is DENIED.

3. That Judgment for the Defendants, and against the Plaintiff be entered by the Clerk of Court.